PER CURIAM.
 

 John Richard Marek, a prisoner under sentence of death, appeals the postconviction court’s orders denying his third and fourth successive motions for postconvic
 
 *988
 
 tion relief, which were filed pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the postconviction court’s orders denying relief.
 

 I. BACKGROUND
 

 Marek was convicted of first-degree murder, kidnapping, attempted burglary, and battery in the 1983 murder of Adella Marie Simmons and was sentenced to death. We affirmed the murder conviction and death sentence on direct appeal.
 
 Marek v. State,
 
 492 So.2d 1055 (Fla.1986). The procedural history of Marek’s post-conviction challenges to his conviction and sentence is set out in this Court’s recent opinion, which affirmed the postconviction court’s denial of Marek’s second successive motion for postconviction relief.
 
 See Marek v. State,
 
 8 So.3d 1123 (Fla.2009).
 

 On April 20, 2009, Governor Charlie Crist signed Marek’s death warrant. On May 1, 2009, while the appeal of the denial of Marek’s second successive postconviction motion was pending, Marek filed a third successive postconviction motion in the circuit court. The motion raised three claims.
 

 In his first claim, Marek contended that newly discovered evidence in the form of an affidavit from Michael J. Conley, a former cellmate of Marek’s codefendant Raymond Wigley, demonstrates that Marek’s conviction and sentence are constitutionally unreliable. In his affidavit, Conley averred that when he and Wigley were incarcerated together in 1996 or 1997, Wigley confessed to strangling the victim after raping her. In his second claim, Marek asserted that Florida’s clemency process and the manner in which the Governor determined that a third death warrant should be signed for Marek was arbitrary and capricious, in violation of the Eighth and Fourteenth Amendments of the United States Constitution. In his third claim, Marek alleged that during his initial postconviction proceeding, Judge Stanton S. Kaplan engaged in ex parte communications with the State regarding the drafting of the order denying postcon-viction relief.
 

 On May 4, 2009, Marek filed a motion for leave to supplement the first claim. He sought to submit an affidavit by Jessie Bannerman, who had been incarcerated with Wigley. In the affidavit, Bannerman averred that he had heard Wigley state that “he had killed” and believed “he would kill again.” On May 5, 2009, Marek filed an emergency motion for a writ of habeas corpus to have another inmate, Robert Pearson, transported to the eviden-tiary hearing on his postconviction motion, but Marek did not attach an affidavit or any statement from Pearson to the motion.
 

 The postconviction court conducted an emergency evidentiary hearing on May 6-7, 2009. At the beginning of the hearing, Marek filed a motion to disqualify the postconviction judge. After hearing argument from the attorneys, the postconviction court denied the motion to disqualify. On May 8, 2009, the postconviction court issued an order denying Marek’s third successive postconviction motion. Marek appealed. In addition to challenging the postconviction court’s denial of his post-conviction claims, Marek argued that the postconviction court erred in treating his motion for judicial disqualification as successive and in denying the facially sufficient motion to disqualify.
 

 On May 11, 2009, this Court issued an order staying Marek’s execution and scheduling oral argument for May 20, 2009. After oral argument, we concluded that the postconviction court erred by treating the motion to disqualify as a successive motion and by denying the motion.
 
 *989
 
 Accordingly, we issued an order reversing and i’emanding to the Circuit Court of the Seventeenth Circuit with directions that a new judge preside over the proceeding with respect to Marek’s postconviction claims. The order noted that the stay of execution remained in effect. On June 1-2, 2009, Judge Jeffrey R. Levenson conducted a new evidentiary hearing on Ma-rek’s third successive motion for postcon-viction relief. (The evidence presented at the evidentiary hearing is discussed in the analysis that follows.)
 

 On June 12, 2009, Marek filed a fourth successive postconviction motion, raising two claims. In his first claim, Marek argued that he is entitled to relief due to the prejudice against Marek of Judge Kaplan, the judge in the initial postconviction proceedings in 1988, and due to Judge Kap-lan’s relationship with defense trial counsel Hilliard Moldof. In support of this claim, Marek relied on
 
 Caperton v. A.T. Massey Coal Co.,
 
 — U.S. -, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009). In his second claim, Marek argued that trial counsel Moldofs testimony at the June 1-2, 2009, evidentiary hearing included newly discovered evidence that Marek did not receive effective assistance of counsel during his penalty phase.
 

 On June 19, 2009, the postconviction court issued orders denying Marek’s third and fourth successive motions for postcon-viction relief. As for the third successive motion, after concluding that Marek was attempting to relitigate his prior claim that “Wigley was the murderer, and because Wigley was sentenced to life, he should be too,” the postconviction court found Ma-rek’s first claim (newly discovered evidence regarding statements made by code-fendant Wigley) to be procedurally barred. Alternatively, the postconviction court denied the claim on the merits, finding that the evidence did not qualify as newly discovered; the testimony about Wigle/s statements would not be admissible in the guilt phase; and even if the evidence were newly discovered and admissible, it would not probably produce an acquittal or a life sentence on retrial. The postconviction court rejected Marek’s second claim (denial of due process in the clemency process) on the basis that the clemency process is a function of the executive branch, not a judicial function. Finally, the postconviction court rejected Marek’s third claim (ex parte communications in the initial post-conviction proceeding) on the basis that it was procedurally barred, speculative, and legally insufficient. With regard to Ma-rek’s fourth successive motion, the post-conviction court summarily denied the motion, reasoning that both claims (prejudice of the initial postconviction judge and ineffective assistance in the penalty phase) had previously been litigated and thus were procedurally barred.
 

 Marek now appeals the postconviction court’s denial of his third and fourth successive postconviction motions. Marek also challenges the postconviction court’s order denying his motion to correct the transcript of the evidentiary hearing testimony of Leon Douglass describing Wigley as a black male and the postconviction court’s failure to rule on his “Motion to Get the Facts” about the assignment of Judge Levenson to this case. Below, we address each of Marek’s motions in turn and conclude that Marek is entitled to no relief.
 

 II. THIRD SUCCESSIVE POSTCONVICTION MOTION
 

 On appeal from the denial of his third successive postconviction motion, Marek raises three claims. He argues that newly discovered evidence demonstrates (A) that both his murder conviction and death sen-
 
 *990
 
 tenee are constitutionally unreliable; (B) that he was denied due process in the clemency process; and (C) that he was denied due process in his initial postconviction proceedings. We begin our analysis of these issues by discussing the standard applicable to all.
 

 To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements. First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See
 
 Jones v. State,
 
 709 So.2d 512, 521 (Fla.1998)
 
 (Jones II).
 
 Newly discovered evidence satisfies the second prong of the
 
 Jones II
 
 test if it “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.”
 
 Jones II,
 
 709 So.2d at 526 (quoting
 
 Jones v. State,
 
 678 So.2d 309, 315 (Fla.1996)). If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence.
 
 See Jones v. State,
 
 591 So.2d 911, 915 (Fla.1991)
 
 (Jones I).
 

 In determining whether the evidence compels a new trial, the postconviction court must “consider all newly discovered evidence which would be admissible” and must “evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.”
 
 Id.
 
 at 916. This determination includes
 

 whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
 

 Jones II,
 
 709 So.2d at 521 (citations omitted).
 

 When, as in this case, the post-conviction court rules on a newly discovered evidence claim after an evidentiary hearing, this Court “review[s] the trial court’s findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence.”
 
 Green v. State,
 
 975 So.2d 1090, 1100 (Fla.2008). In addition, “we review the trial court’s application of the law to the facts de novo.”
 
 Id.
 

 A. Wigley’s Statements
 

 At the time of Marek’s trial, code-fendant Wigley had given a sworn statement. In that statement, Wigley said that after he and Marek beat and raped the victim, he saw Marek tie a bandanna— which was used as a ligature — around the victim’s neck. Wigley said that he did not “use” the bandana on the victim but indicated that Marek had done so. Wigley also stated that Marek offered the victim and her friend a ride to a phone booth but that he “didn’t offer them nothing.” The postconviction evidentiary hearing testimony that Wigley made statements contradicting his sworn statement did not exist at the time of trial and could not have been discovered except by casting a wide investigatory net. For purposes of our analysis here, we assume that Marek’s counsel could not have presented the witnesses previously through the exercise of due diligence and focus on whether the evidence probably would result in an acquittal or life sentence on retrial.
 

 1. Evidence
 

 In determining whether newly discovered evidence would probably result in an
 
 *991
 
 acquittal or a lesser sentence, the new evidence must be viewed in conjunction with the evidence presented at trial. Thus, the Court evaluates all the admissible newly discovered evidence, including any admissible newly discovered evidence presented in prior postconviction proceedings, and compares it with the evidence that was introduced at trial. Marek erroneously contends that the Court also must consider all of the evidence he presented in his prior postconviction proceedings in an effort to establish ineffective assistance of trial counsel.
 
 See Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (holding that to establish a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel was constitutionally deficient and, as a result, defendant was prejudiced). Marek overlooks that throughout the extensive postconviction litigation of his case, his counsel has never been found deficient. Marek’s claims of ineffective assistance of counsel have been denied because he has failed to establish deficiency or because they were procedurally barred. Where the prior claims of ineffective assistance of counsel have not satisfied the deficiency prong of
 
 Strickland
 
 or have been found to be procedurally barred, this Court need not reconsider evidence previously submitted in support of a claim of ineffective assistance of counsel.
 
 See Kight, v. State,
 
 784 So.2d 396, 403 (Fla.2001) (rejecting Eight’s contention that the court must consider all of the evidence that was not presented at trial, including all evidence presented in any postconviction proceedings);
 
 Jones II,
 
 709 So.2d at 522 n. 7 (“We reject Jones’ argument that we must consider all testimony previously heard at the 1986 and 1992 evidentiary hearings, even if the testimony had previously been found to be barred or not to qualify as newly discovered evidence.”).
 

 This Court recited the relevant evidence adduced at trial in its opinion affirming the conviction and sentence on direct appeal.
 
 Marek,
 
 492 So.2d at 1056-58. The evidence showed that at approximately 11:30 p.m., June 16, 1983, Marek and Wigley stopped by the victim’s car on the turnpike, where the victim and her friend were stranded. Marek worked on the car for over forty minutes and engaged the women in conversation; Wigley never spoke and only briefly exited his truck. Eventually, Marek offered to take one, not both, of the women to a service station. At approximately 3:35 a.m. the following day, officers found the codefendants’ pickup truck at Dania Beach, and when the code-fendants appeared, Marek spoke to the police and joked with them, while Wigley remained silent. Several hours later, the victim’s beaten and bruised body was found in the nearby lifeguard shack, and the evidence indicated that she was strangled to death with a ligature at approximately 3:00-3:30 a.m. Marek’s fingerprint was found inside the lifeguard shack.
 

 Wigley did not testify at Marek’s trial, but Marek did testify. He claimed that he fell asleep as soon as the victim was in the truck. He awoke later and asked Wigley where the victim was, and Wigley, who was driving, responded that he had already dropped her off at a service station. They continued to drive, and Marek went back to sleep. He awoke hours later and found Wigley at the lifeguard shack. He climbed up into the shack and was there for fifteen or more minutes, but he never saw the victim’s body because it was dark. During the penalty phase, the sole witness was a deputy from the jail who testified that Marek was polite and never caused problems when she was on duty. Marek did not testify in the penalty phase.
 

 Marek was convicted of first-degree murder and sentenced to death. In his
 
 *992
 
 separate trial, Wigley was convicted of first-degree murder and sentenced to life in prison. In affirming Marek’s death sentence on direct appeal and denying Ma-rek’s challenge to his disparate sentence, this Court outlined the basis for its determination as follows:
 

 The evidence in this case clearly established that appellant, not Wigley, was the dominant actor in this criminal episode. Both appellant and the victim’s traveling companion testified that appellant talked to the two women for approximately forty-five minutes after he stopped, purportedly to aid them. During most of this conversation, Wigley remained in the truck. When Wigley got out of the truck to join appellant, he remained silent. Appellant, not Wigley, persuaded the victim to get in the truck with the two men. That evidence was reinforced by the testimony of three witnesses who came into contact with the appellant and Wigley on the beach at approximately the time of the murder, which indicated that appellant appeared to be the more dominant of the two men. Finally, only appellant’s fingerprint was found inside the observation deck where the body was discovered. This evidence, in our view, justifies a conclusion that appellant was the dominant participant in this crime.
 

 Marelc,
 
 492 So.2d at 1058.
 

 The newly discovered evidence in this case consists of statements Wigley made to other prisoners while he was serving his life sentence.
 

 Jessie Bannerman testified that Wigley spoke about the murder on two occasions, once while they were drinking moonshine and once while smoking marijuana. In sum, Wigley told Bannerman that he was convicted for killing a woman and that he had choked her to death out of fear she would identify him. Bannerman said that he believed Wigley because of the details, but he also said that he thought Wigley was boasting about his heterosexuality and dangerousness to keep other inmates from pursuing him for homosexual sex.
 

 Robert Pearson, who was an inmate law clerk, testified that he spoke to Wigley in that capacity. Pearson said that Wigley’s story concerning the murder changed each time Wigley told it and that Wigley told him “three or four different versions.” Wigley reportedly said the victim laughed at him for failing to achieve an erection, whereupon Wigley — depending on the account-choked her
 
 to
 
 death
 
 or
 
 passed out and awoke to find her dead. Pearson explained that
 

 [Wigley would] fluctuate, at one point he’d talk to me about it and he’d be solid that he choked her, he pretty much killed her, and then the next version he would tell me is that he passed out and he didn’t remember anything, but when he woke up she was there.... He was just always ... adding stuff or taking stuff away.
 

 Wigley also reportedly told Pearson that Wigley, not Marek, spoke with the victim and her friend and convinced the victim to get into the truck with Wigley.
 

 Carl Mitchell testified that he overheard Wigley threaten John Blackwelder, Wig-ley’s homosexual lover (who subsequently killed Wigley, see
 
 Blackwelder v. State,
 
 851 So.2d 650 (Fla.2003)), saying, “Don’t make me kill you ‘cause I already got — I already killed somebody else.” Mitchell attributed no meaning to this comment because it was his belief that a lot of prison inmates say things like this out of anger or fear, and Wigley and Blackwelder argued all the time.
 

 William Green testified that he frequently overheard his cellmate Blackwelder talking to Wigley and thus knew that Wig-
 
 *993
 
 ley was convicted of murder. He testified that Blackwelder told Wigley he would kill Wigley if Wigley cheated on him. Wigley responded, “I killed before, I’ll kill again, so it don’t matter.” Green said the pah’ were not fighting, “they’re just two lovers talking, it was normal” and that such talk is normal in prison. Green stated that Blackwelder and Wigley often made such comments to each other.
 

 Leon Douglass said he spoke to Wigley in his capacity as an inmate law clerk at Columbia Correctional Institution (Columbia). Douglass said that Wigley claimed to have killed the victim by strangling her and was angry with Marek for some unnamed but unforgivable wrong Marek did to him. Douglass testified that he was transferred to Columbia in August 2000, but the State admitted records from the Department of Corrections (DOC) that showed that'Douglass was not sent to Columbia until November 2000. Either way, Douglass could not have had a conversation with Wigley in Columbia because Wig-ley was killed on May 6, 2000. When cross-examined concerning the time and place of his claimed conversation with Wig-ley, Douglass testified that perhaps the conversation occurred at Martin Correctional Institution (Martin). However, DOC records show that Wigley and Douglass were never housed at Martin or any other facility at the same time. Moreover, when asked to describe Wigley, Douglass erroneously said he was a black man. (As discussed below, Marek contends that this statement in the transcript of the eviden-tiary hearing is the result of error by the court reporter.)
 

 Finally, Michael Conley’s testimony from the prior evidentiary hearing on Ma-rek’s third successive posteonviction motion was admitted by stipulation. During that hearing, Conley testified that in the mid-1990s he spoke with Wigley about Wigley’s case. Wigley broached the topic with Conley because Conley’s wife worked for a law firm and Wigley hoped to obtain pro bono legal assistance. Conley described the conversation as follows:
 

 So, he said, well, he said, I was involved in a murder, you know that.
 

 We met a lady on the Florida Turnpike. We took her and wound up having sex with her along the way, on the Florida Turnpike, forcing her and beating her and took her to someplace in Florida ... it was a lifeguard station or something.
 

 I said, well, what happened?
 

 He said, we repeatedly raped her.
 

 I said, you know, who?
 

 He said, me and the other guy that’s on death row.
 

 I said, well how come you’re not on. death row?
 

 He said, well, I got a life sentence.
 

 I said, Ray — I looked him right in the eye — I said, Raymond, did you kill [that] woman, and he said, no. I said, Ray, again, did you kill that woman? He said, no. Then he said — I said to him, I said, Ray, I’m not going to help you.
 

 He said, I killed the woman, Mike. I strangled her.
 

 I said to him, how did you strangle her?
 

 He said with a scarf or a handkerchief, I believe. It’s been so long.
 

 Knowing Raymond Wigley- — I told you I’m going to be honest about this— he was a wimp, a real wimp, and it was hard for me to visualize him killing anybody. But in the Department of Corrections, wimps are the ones you got to watch out for. They’ll kill you first before they get killed, and so whether he killed her or not, I don’t know. That’s up to the supreme court to decide. I can only tell you what he told me.
 

 
 *994
 
 He was crying when he told me that, so, I tended to believe him or he was a heck of an actor, one or the other.
 

 Before proceeding with the analysis, we observe that even if we assume that the witnesses accurately recounted what Wig-ley had said to them, this newly discovered evidence is of minimal value because there is no reason to believe that Wigley was being truthful when he made the statements which lessened the culpability of Marek. Certain of Wigley’s statements are vague statements (“I’ve killed before”) that have no express connection with the murder of Ms. Simmons. Other statements which are connected with Simmons’ death reveal specific details that Wigley would have known by virtue of his being present at the crime for which he was convicted (e.g., the victim was strangled). Furthermore, most of the witnesses con--sidered Wigley’s statements to have been boasting or otherwise self-interested, rather than unadulterated expressions of guilt. The testimony suggests that Wigley’s acquaintances did not necessarily believe Wigley, and the evidence showed that Wig-ley’s statements were either calculated to garner favor or were “tough talk” for prison as a means of self-protection, intimidation, or braggadocio. The testimony that Wigley was a small, “wimpy” man was uncontradicted, and several witnesses suggested that he may have made the claims for his own personal protection. Wigley made the statements in situations in which he was being questioned about his sexual orientation and thus felt a need to brag, was arguing or talking to his lover, or was under the influence of alcohol or drugs. Even his statements to Conley — which contain the admission that Wigley strangled the victim — were made after he had denied killing the victim and feared that Conley would not help him obtain legal assistance to challenge his murder conviction. In addition, when speaking to Pearson, Wigley equivocated about whether he remembered strangling the victim. Given the inconsistencies in Wigley’s statements and the strong inference that the statements constituted prison “tough talk” and were calculated by Wigley to obtain some advantage for himself, the probative value of the testimony recounting Wigley’s statements is negligible.
 

 2. Guilt Phase
 

 Newly discovered evidence will not be “of such nature that it would probably produce an acquittal on retrial,” as required by
 
 Jones II,
 
 709 So.2d at 521, if it would not be admissible in a new trial. Marek acknowledges that the evidence recounting Wigley’s statements is hearsay but argues that the testimony would be admissible pursuant to the statements against interest hearsay exception or as a matter of due process under
 
 Chambers v. Mississippi,
 
 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Marek’s arguments are without merit. The postconviction court correctly determined that this evidence would not be admissible during the guilt phase of trial and that, as a result, the evidence would not probably produce an acquittal on retrial.
 

 First, Marek has failed to demonstrate that the testimony about Wigley’s statements would be admissible in the guilt phase as a statement against interest pursuant to section 90.804(2)(c), Florida Statutes (2008). Section 90.804(2)(c) provides that where the declarant is unavailable as a witness, there is a hearsay exception for statements against the declarant’s interest:
 

 Statement against interest.
 
 — A statement which, at the time of its making, was so far contrary to the declarant’s pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a per
 
 *995
 
 son in the declarant’s position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
 

 Marek fails to show that Wigley’s statements were within the scope of this hearsay exception.
 

 Wigley’s statements that he killed before or that he strangled the victim were not “so far contrary to the declarant’s pecuniary or proprietary interest” that “a person in the declarant’s position would not have made the statement unless he or she believed it to be true.” § 90.804(2)(e), Fla. Stat. (2008). At the time of his statements to Conley, Bannerman, Pearson, and Blackwelcler (as overheard by Mitchell and Green), Wigley was serving a life sentence for the first-degree murder of Simmons. He could not be retried for that crime as a result of confessing to being the person who actually strangled Simmons. In addition, this Court has held that where an inmate recants trial testimony many years after trial, he would not reasonably believe that he could be prosecuted for perjury.
 
 See Lightbourne v. State,
 
 644 So.2d 54, 57 (Fla.1994). Finally, Wigley’s statements would not have exposed him to civil liability for the intentional torts committed against Simmons. A civil suit must be brought within the applicable statute of limitations, which would be either two or four years, depending on the cause of action asserted.
 
 See
 
 § 95.11(3)(o), Fla. Stat. (1983) (establishing four-year statute of limitations for actions based on intentional torts); § 95.11(4)(d), Fla. Stat. (1983) (establishing two-year statute of limitations for wrongful death actions). Simmons was murdered in June 1983. Thus, Wigley’s statement to Bannerman, made sometime after they encountered one another in Union Correctional Institution in 1987, likely occurred after the statute of limitations had run. Wigley’s statements to Conley in the mid-1990s, his statements to Pearson, which occurred sometime in 1999 or 2000, and his statements to Blackwelder, which were overheard by Mitchell and Green no earlier than 1998, would not have exposed Wigley to civil liability because the statute of limitations had expired.
 

 Second, Marek has failed to demonstrate that any of the testimony about Wigley’s confessions is admissible pursuant to
 
 Chambers,
 
 where the United States Supreme Court held that in some circumstances, due process requires the bending of technical rules of evidence regarding confessions by third parties.
 
 Chambers
 
 was limited to “the facts and circumstances of th[at] case” in which the excluded testimony “bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest.” 410 U.S. at 302-03, 93 S.Ct. 1038. This Court has repeatedly explained that
 
 Chambers
 
 provides for the admission of hearsay only where the confession sought to be admitted bears indicia of reliability.
 
 See, e.g., Grim v. State,
 
 841 So.2d 455, 464 (Fla.2003) (“Grim’s claim relies upon
 
 Chambers
 
 ...; however, he fails to recognize that in
 
 Chambers,
 
 the court held that the hearsay statements of a third person who orally confessed to the murder should have been admitted because the statements’ reliability was clearly established.”). As discussed above, Marek has not shown that Wigley’s statements were reliable. Accordingly, Marek has not demonstrated that testimony about Wigley’s confession would be admissible in the guilt phase of a retrial.
 

 Based on the foregoing, the postconviction court did not err in concluding that Marek is not entitled to a new guilt phase.
 

 
 *996
 
 3. Penalty Phase
 

 Section 921.141(1), Florida Statutes (2008), expressly provides for the admission of hearsay testimony in the penalty phase of a death case:
 

 In the [penalty phase] proceeding, evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in [the statute].
 
 Any such evidence -which the cowii deems to have -probative value ■may be received,, regardless of its admissibility under the exclusionary rules of evidence, -provided the defendant is accorded a fair opportunity to rebut any hearsay statements.
 
 However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida.
 

 (Emphasis added.) This statute provides “wide latitude ... in admitting penalty-phase evidence.”
 
 Rutherford v. State,
 
 727 So.2d 216, 221 (Fla.1998). The admissibility of hearsay, however, is not unlimited. The statute clearly conditions the admission of hearsay by the State on whether the defendant has a fair opportunity to rebut it. Further, we have held that the same condition applies to the admission of hearsay evidence presented by the defendant.
 
 Blackwood v. State, 777
 
 So.2d 399, 411-12 (Fla.2000) (“[T]he statute clearly states that the defendant must have an opportunity to fairly rebut the hearsay evidence in order for it to be admissible.... This rule applies to the State as well.”);
 
 see Hitchcock v. State,
 
 578 So.2d 685, 690 (Fla.1990) (“While the rules of evidence have been relaxed somewhat for penalty proceedings, they have not been rescinded. We find no merit to Hitchcock’s claim that the state must abide by the rules but that defendants need not do ■so”). Accordingly, because in this case we assume that the due diligence prong was met, Wigley’s statements to the six witnesses would be admissible in a new penalty phase only if the State would have a fair opportunity to rebut the evidence. As explained below, the State has ample, admissible rebuttal evidence; thus, Wigley’s statements would be admissible.
 

 Having determined that Wigley’s statements are admissible, the next question is whether introduction of Wigley’s statements in the penalty phase would probably yield a less severe sentence.
 
 Kormondy v. State,
 
 983 So.2d 418, 437-38 (Fla.2008) (citing
 
 Jones I,
 
 591 So.2d 911). To make this determination, we must consider in a cumulative analysis the testimony of the witnesses reporting Wigley’s statements along with the evidence presented at Ma-rek’s trial and penalty phase that we outlined above.
 

 For the reasons discussed previously, we conclude that Wigley’s statements would not be credited by either the jury or the trial court. Through cross-examination, the State could readily demonstrate that most of the witnesses did not credit Wig-ley’s statements. For the most part, the witnesses attributed Wigley’s “admissions” to the kind of “tough talk” necessary for self-protection or simply everyday parlance in prison. Further, some of Wigley’s statements contradicted his own previous statements and others conflicted with otherwise unchallenged trial testimony, such as his claim that he — not Marek — talked the victim into getting into the truck. In addition, under section 921.141, the State could submit the sworn statement Wigley made shortly after the murder. In it, Wigley detailed what both he and Marek did with the victim from the time she got in the truck until they left her brutalized
 
 *997
 
 and lifeless body some three hours later. Wigley admitted his participation in the crimes and implicated Marek as the dominant actor.
 

 When considered in context, the newly discovered evidence does not significantly undermine the evidence of Marek’s dominant role in the crime. Marek was charged in the alternative with premeditated and felony first-degree murder, and in opening and closing arguments, the State’s theory of prosecution was explained to the jury in the alternative as well. That is, either Marek killed Simmons, or Wigley killed her and Marek was a principal to the premeditated murder or a participant in the felony murder. Based on the evidence we recited above, the jury found him guilty of first-degree murder. Other than the jail deputy’s testimony that Marek was a well-behaved prisoner, no other testimony or evidence was adduced in the penalty phase. Accordingly, in finding Marek guilty and in recommending a sentence of death (by a vote of ten to two), the jury clearly did not believe Marek’s trial testimony that he slept through the entire criminal episode and never saw the victim even as he walked around for a quarter of an hour inside the small lifeguard shack where the body of Adella Simmons lay.
 

 In imposing the death sentence, the trial court found four aggravators and no mitigation.
 
 Marek,
 
 492 So.2d at 1057. One of those aggravators was subsequently stricken; thus, the sentence rests on the aggra-vators that the murder was (1) especially heinous, atrocious, or cruel (HAC); (2) committed in the course of attempted burglary with the intent to commit a sexual battery and in the course thereof an assault was committed; and (3) committed for pecuniary gain.
 
 See Marek v. Singletary,
 
 626 So.2d 160, 161-62 (Fla.1993) (noting that this Court previously affirmed the postconviction court’s striking of the prior violent felony aggravator). None of these aggravators rests on a determination that Marek was the actual killer, and none of the aggravating factors are undermined by the newly discovered evidence.
 

 Although this Court has previously held that a codefendant’s life sentence precluded a death sentence for the other defendant, we have held otherwise when the codefendant sentenced to death is found to be the dominating force in the crime.
 
 See Stein v. State,
 
 995 So.2d 329, 341 (Fla.2008) (“However, the triggerman has not been found to be the more culpable where the non-triggerman codefendant is ‘the dominating force’ behind the murder.”). In
 
 Henyard v. State,
 
 992 So.2d 120 (Fla.2008), for example, the defendant brought a similar claim to this Court, relying on newly discovered evidence that while his codefen-dant awaited trial, another inmate overheard him brag that he was a “killa.” Henyard and his codefendant kidnapped a woman and her two children from a parking lot, raped and shot the woman, and killed the two children. This Court held that even assuming the statement was admissible as newly discovered evidence, the admission of this statement would not probably yield a lesser sentence.
 
 Id.
 
 at 126. We found that the State’s case at trial “relied on [Henyard’sj dominant role in the entire criminal episode and unrefut-ed evidence of his close proximity to the child victims at the time of their deaths.”
 
 Id.
 
 The identity of the actual killer was unimportant in light of “Henyard’s substantial culpability.”
 
 Id.
 

 We reach the same conclusion in this case. In affirming Marek’s death sentence in light of Wigley’s life sentence, we cited evidence and determined that Marek, “not Wigley, was the dominant actor in the criminal episode.” Marek, 492 So.2d at 1058. Wigley’s statements are not credible. They would have no effect on the
 
 *998
 
 previous determination that — without regard to the identity of the actual killer— Marek’s death sentence is appropriate due to his dominant role in the entire criminal episode.
 

 Wigley’s statements do not undermine Marek’s convictions for first-degree murder, kidnapping, attempted burglary, and battery. Nor do they undermine the evi-dentiary basis for the three aggravating factors supporting the death sentence. They do not call into question the conclusion that Marek played the dominant role in this murder. When considered in context with the other evidence from Marek’s guilt and penalty phases, Wigley’s post-trial statements — which were made years after the crime and in circumstances which provide no indication of reliability — lack both weight and credibility. Accordingly, we hold that then- admission in the penalty phase would not probably result in a lesser sentence.
 

 B. Clemency
 

 In his next claim of newly discovered evidence, Marek contends that Florida’s clemency process and the
 
 manner
 
 in which the Governor signed his death warrant are unconstitutional. The postconviction court did not err in denying this claim.
 

 Marek argues that Florida’s clemency process, particularly the Governor’s authority to sign warrants, is unconstitutional because it does not provide sufficient due process to the condemned inmate. He asserts that public records documenting that the Governor reviewed Marek’s case in September 2008 without input from Marek demonstrate that he was denied due process. Marek contends that because he did not obtain the public records until April 27, 2009, he could not have raised this claim in a prior proceeding. However, Marek did raise this claim in his second successive postconviction proceeding. In that proceeding, Marek analogized the Govei-nor’s decision to sign his death warrant to a lottery and contended that Florida’s clemency process was one-sided, arbitrary, and standardless. This Court rejected Marek’s challenges as mer-itless.
 
 See Marek,
 
 8 So.3d at 1129-30 (rejecting constitutional challenge to Florida’s clemency process and declining to “second-guess” the application of the exclusive executive function of clemency). The current claim raises the same legal challenge this Court previously considered.
 

 The April 27, 2009, public records do not affect this Court’s prior decision. This Court did not dispute Marek’s factual assertion that he was not informed of the Governor’s request for information about him in September 2008 but, rather, decided that as a matter of law we would not “second-guess” the executive clemency process. Marek has not provided any authority holding that he must be provided notice before a death warrant is signed or that the Governor may not sign the death warrant of an individual whose death sentence is final and who has had the benefit of a clemency proceeding. In
 
 Ohio Adult Parole Authority v. Woodard,
 
 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998), five justices of the United States Supreme Court concluded that some minimal procedural due process requirements should apply to clemency proceedings. But none of the opinions in that case required any specific procedures or criteria to guide the executive’s signing of warrants for death-sentenced inmates. Accordingly, Marek has not provided any reason for this Court to depart from its prior decision.
 

 C. Ex Parte Order
 

 In his third claim of newly discovered evidence, Marek contends that during his initial postconviction proceeding, Judge Kaplan engaged in ex parte communica
 
 *999
 
 tions with the State regarding the drafting of the order denying postconviction relief. Marek’s counsel asserted that while preparing the initial brief in the appeal of Marek’s second successive postconviction motion, he noticed that the type and style of Judge Kaplan’s order denying Marek’s motion was the same as the State’s reply to Marek’s motion. Marek’s counsel also realized that the prosecutor who drafted the answer to Marek’s initial postconviction motion was the same prosecutor who was found to have engaged in ex parte communications in
 
 Rose v. State,
 
 601 So.2d 1181 (Fla.1992), and
 
 Smith v. State,
 
 708 So.2d 253 (Fla.1998). From the similarities in the documents and the identity of the prosecutor, Marek’s counsel infers that an ex parte communication must have occurred during the initial postconviction proceeding. We agree with the postcon-viction court that this claim is procedurally barred.
 

 Marek has not established that the facts and law underlying this claim were not previously discoverable through due diligence. Since 1988, the order and the State’s reply to Marek’s postconviction motion were readily available for comparison. Moreover, the record from Marek’s initial postconviction hearing suggests that Ma-rek was aware that the prosecutor could be drafting an order ex parte denying relief. At the conclusion of the initial post-conviction proceedings in 1988, Judge Kap-lan told the State that he would postpone issuing a final ruling on all of the claims and specifically told Marek’s counsel, “I will rule Monday. I’ll let you know Monday or I’ll let Mr. [Paul] Zacks know and maybe you can call.” In response to Judge Kaplan’s comments, Zacks (the prosecutor) then said, ‘Yes, sir. I’ll let everybody know the second I hear from you.” Given this record, Marek has failed to establish how this claim is not barred. Accordingly, the postconviction court did not err in denying this claim.
 

 III. FOURTH SUCCESSIVE POSTCONVICTION MOTION
 

 On appeal from the denial of his fourth successive postconviction motion, Marek raises two claims. He argues that newly discovered evidence demonstrates (A) that-based on the United States Supreme Court’s recent decision in
 
 Caperton
 
 — Ma-rek’s right to due process was violated when Judge Kaplan presided over Marek’s 1984 sentencing and the 1988 evidentiary hearing on his initial motion for postcon-viction relief; and (B) that he received ineffective assistance of counsel during the penalty phase. The postconviction court summarily denied these claims without holding a case management conference or an evidentiary hearing.
 

 Even if we assume that the post-conviction court should have held a case management conference pursuant to rule 3.851(h)(6), any error was harmless. The failure to hold a hearing on a successive postconviction motion that is legally insufficient on its face is harmless error.
 
 See Davis v. State,
 
 736 So.2d 1156, 1159 n. 1 (Fla.1999);
 
 see also Groover v. State,
 
 703 So.2d 1035, 1038 (Fla.1997) (“[E]ven if a
 
 Huff [v. State,
 
 622 So.2d 982 (Fla.1993),] hearing had been required in the instant case, the court’s failure to do so would be harmless as no evidentiary hearing was required and relief was not warranted on the motion.”). As explained below, Ma-rek’s fourth successive postconviction motion was legally insufficient on its face and without merit.
 

 The postconviction court summarily denied the two claims Marek raised in his fourth successive postconviction motion. “Postconviction claims may be summarily denied when they are legally insuf
 
 *1000
 
 ficient, should have been brought on direct appeal, or are positively refuted by the record.”
 
 Connor v. State,
 
 979 So.2d 852, 868 (Fla.2007). Because a postconviction court’s decision whether to grant an evi-dentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law, subject to de novo review.
 
 See State v. Coney,
 
 845 So.2d 120, 137 (Fla.2003).
 

 A.
 
 Caperton
 
 Claim
 

 Marek argues that his constitutional right to due process was violated under
 
 Caperton
 
 when Judge Kaplan presided over Marek’s 1984 sentencing and the 1988 evidentiary hearing on his initial motion for postconviction relief. Marek raised a substantially similar claim in his recent appeal, arguing that when
 
 Caperton
 
 was issued, it would apply to his claim. In our previous opinion, we agreed with the post-conviction court that Marek’s due process claim was legally insufficient and merit-less, and we found it likely that any decision in that case would be irrelevant to Marek’s case.
 
 Marek,
 
 8 So.3d at 1131. In
 
 Caperton,
 
 the Supreme Court determined on the basis of extraordinary facts regarding a litigant’s campaign contributions to a state supreme court justice that the Constitution required the justice to grant the opposing party’s motion to disqualify him in the case.
 
 Caperton,
 
 129 S.Ct. at 2257. Now that
 
 Caperton
 
 is final, we are certain that it is irrelevant to Marek’s case. The claim is procedurally barred.
 
 See
 
 Fla. R.Crim. P. 3.851(d). Accordingly, the trial court did not err in denying this claim in Marek’s fourth successive postconviction motion.
 

 B. Ineffective Assistance of Counsel Claim
 

 Marek contends that the postconviction court erred in failing to grant an evidentia-ry hearing on his claim that newly discovered evidence reveals that his trial counsel, Hilliard Moldof, provided ineffective assistance of counsel. Marek’s claim is based on the State’s cross-examination of Moldof during the most recent evidentiary hearing. At the hearing, Moldof expressed the opinion that his performance during Ma-rek’s penalty phase was deficient. Marek is not entitled to relief on this claim.
 

 We have previously explained that trial counsel’s own admission that he or she was ineffective is not evidence of counsel’s performance and thus fails to form the basis for an ineffective assistance of counsel claim.
 
 See Breedlove v. State,
 
 692 So.2d 874, 877 n. 3 (Fla.1997) (noting that “an attorney’s own admission that he or she was ineffective is of little persuasion” in determining whether trial counsel was ineffective);
 
 Routly v. State,
 
 590 So.2d 397, 401 n. 4 (Fla.1991);
 
 Kelley v. State,
 
 569 So.2d 754, 761 (Fla.1990). Moreover, in this claim, Marek wholly fails to address how Moldof s opinion could possibly establish the prejudice prong of a claim of ineffective assistance of counsel. Accordingly, the postconviction court did not err in summarily denying this claim.
 

 IV. OTHER CLAIMS
 

 Marek challenges the postconviction court’s denial of his motion to correct the transcript, and he requests that this Court relinquish jurisdiction to the postconvietion court for the purpose of conducting an evidentiary hearing on how Judge Leven-son came to be assigned to this proceeding. Marek is not entitled to relief on either point.
 

 A. Motion to Correct Transcript
 

 The official transcript of the June 1-2, 2009, evidentiary hearing indicates that when asked to described Wigley, Leon Douglass stated that “[h]e was a black male, kind of skinny, brownish/blackish
 
 *1001
 
 hair, dark-colored hair, if you will, five-foot-seven, -eight.” Marek’s counsel filed a motion to correct the transcript, asserting that he did not hear Douglass describe Wigley — who was white — as a black male and requesting a hearing to address the accuracy of the transcript. The posteon-viction court denied the motion, finding that the transcript was not in error. The posteonviction court explained that it had “a specific recollection that Mr. Douglass described Raymond Wigley as a black man.” On appeal, the defense contends that the postconviction court erred in denying the motion to correct “without allowing the parties an opportunity to listen to the backup tape of the testimony.” Yet, defense counsel also asserts that the court reporter who transcribed the hearing stated “that he did not recall Mr. Douglass describing Raymond Wigley as a black male, but that was what it soundly [sic] like Mr. Douglass said on the backup tape.” On this record, we cannot say that the postconviction court erred.
 
 Cf. Matson v. State,
 
 445 So.2d 1121 (Fla. 5th DCA 1984) (relinquishing jurisdiction for trial court to conduct evidentiary hearing on motion to correct transcript where court reporter averred that she erroneously transcribed her notes). In any event, given the context of all the evidence at the evidentiary hearing and the negligible probative value of Douglass’s testimony, any error with respect to this motion was necessarily harmless.
 

 B. Motion to Get the Facts
 

 Finally, Marek requests that this Court relinquish jurisdiction to the postconviction court for the purpose of conducting an evidentiary hearing on how Judge Leven-son came to be assigned to this proceeding. We hereby deny Marek’s motion to relinquish.
 

 The record indicates that after this Court issued an order reversing and remanding the prior order denying Marek’s third successive postconviction motion, the clerk of the Seventeenth Judicial Circuit Court assigned the postconviction proceeding on remand to Judge Levenson. Meanwhile, on May 21, 2009, the State sent a notice to Chief Judge Tobin of the Seventeenth Circuit, informing him of this Court’s order. The notice requested that Chief Judge Tobin assign a new judge to preside over the proceedings on remand as ordered by this Court. Chief Judge Tobin assigned a judge to the case but later rescinded this assignment upon learning that the clerk had assigned the case to Judge Levenson.
 

 During the June 1-2, 2009, evidentiary hearing, defense counsel asked Judge Le-venson about the order assigning a judge other than Judge Levenson to the case and the order rescinding that assignment. Judge Levenson explained that after this Court’s remand order issued, the circuit court clerk’s office randomly assigned the case to Judge Levenson using its standard procedure but that “[independent of that, Chief Judge Tobin received the same directive from the Supreme Court and took it upon himself to assign it specifically to an administrative judge.” Judge Leven-son stated that because “we all felt that the proper procedure was to have it done randomly, we abided by the procedure followed by the constitutional officer, the Clerk of Courts.” Judge Levenson asked defense counsel if he had any objections, and defense counsel raised no objection.
 

 On June 24, 2009, defense counsel filed in the postconviction court a document titled “Motion to Get the Facts,” asserting that the defense had not been timely informed of the State’s notice to Chief Judge Tobin and requesting that the postconviction court conduct an evidentiary hearing about how this proceeding was assigned to Judge Levenson. The postconviction court
 
 *1002
 
 did not rule on the motion. On appeal, defense counsel asks this Court to relinquish jurisdiction for an evidentiary hearing and continues to assert that he was not aware of the State’s contact with Chief Judge Tobin until after the evidentiary hearing. The State contends that it emailed defense counsel a copy of the notice on May 21, 2009.
 

 Contrary to Marek’s claim that an evi-dentiary hearing is required to determine how Judge Levenson was assigned to this proceeding, the record establishes that the clerk randomly assigned the case to Judge Levenson. Defense counsel does not dispute this fact. The defense does not allege that the case was assigned to Judge Le-venson by a nonstandard procedure. Nor does defense counsel allege any impropriety or appearance of impropriety by Judge Levenson. The only disputed factual issue is whether the State in fact emailed defense counsel on May 21, 2009, to inform defense counsel of its notice of remand sent to Chief Judge Tobin. No evidentia-ry hearing is needed to resolve this factual issue because it is immaterial. There is no allegation that the State engaged in any ex parte communication with the judge who presided over Marek’s hearing. The State’s notice sent to Chief Judge Tobin pertains to a “strictly administrative matter[ ] not dealing in any way with the merits of the case.”
 
 Rose v. State,
 
 601 So.2d 1181, 1183 (Fla.1992) (emphasis removed) (prohibiting judges from engaging in any conversation about a pending case with one party outside the presence of the other party but excluding conversations about administrative matters from this prohibition). Because the defense has not presented any legal issue that requires the resolution of a disputed material factual question, we deny Marek’s request that this Court relinquish jurisdiction to conduct an evidentiary hearing.
 

 V. CONCLUSION
 

 For the reasons stated above, we affirm the postconviction court’s orders denying Marek’s third and fourth successive motions for postconviction relief. We also affirm the postconviction court’s order denying Marek’s motion to correct the transcript and deny his motion
 
 to
 
 relinquish jurisdiction.
 

 No motion for rehearing will be entertained by this Court. The mandate shall issue immediately. We hereby lift the stay imposed by this Court on May 11, 2009.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 LEWIS, J., concurs in result only.