# Supreme Court of Florida

_____

No. SC16-576
_____

**ERNEST D. SUGGS**,
Appellant,

vs.

**STATE OF FLORIDA**,
Appellee.

[November 9, 2017]

PER CURIAM.

Ernest D. Suggs, a prisoner under sentence of death, appeals the circuit

court's denial of his successive motion for postconviction relief filed pursuant to

Florida Rule of Criminal Procedure 3.851.  We have jurisdiction.  See art. V, §

3(b)(1), Fla. Const.  We affirm for the reasons that follow.

## BACKGROUND

We previously summarized the evidence presented at Suggs's trial as

follows:

> Pauline Casey, the victim, worked at the Teddy Bear Bar
> in Walton County.  On the evening of August 6, 1990,
> the bar was found abandoned, the door to the bar was
> ajar, cash was missing from the bar, and the victim's car,

purse, and keys were found at the bar. The victim was missing. Ray Hamilton, the victim's neighbor, told police that he last saw the victim shooting pool with an unidentified customer when he left the bar earlier that night. Based on Hamilton's description of the customer and the customer's vehicle, police issued a BOLO for the customer. Subsequently, a police officer stopped a vehicle after determining that it matched the BOLO description.

The driver of the vehicle was identified as the appellant, Ernest Suggs. Although he was not then under arrest, Suggs allowed the police to search his vehicle and his home. While searching Suggs' home, the police found, in a bathroom sink, approximately $170 cash in wet bills, consisting of a few twenty-, ten-, and five-dollar bills and fifty-five one-dollar bills.

Meanwhile, police obtained an imprint of the tires on Suggs' vehicle and began looking for similar tire tracks on local dirt roads. Similar tire tracks were found on a dirt road located four to five miles from the Teddy Bear Bar. The tracks turned near a power line, and the victim's body was found about twenty to twenty-five feet from the road. The victim had been stabbed twice in the neck and once in the back; the cause of death was loss of blood caused by these stab wounds. After the victim was found, Suggs was arrested for her murder.

In addition to the cash and tire tracks, police obtained the following evidence connecting Suggs to the murder: one of the three known keys to the bar and a beer glass similar to those used at the bar were found in the bay behind Suggs' home; the victim's palm and fingerprints were found in Suggs' vehicle; and a serologist found a bloodstain on Suggs' shirt that matched the victim's blood. Additionally, after his arrest, Suggs told two cellmates that he killed the victim.

In his defense, Suggs contended that he was framed and made the following claims: that he had small

bills because his parents had paid him in cash for working on their dock; that the money was wet because he fell in the water while working on the dock; that other vehicles have tires similar to the tires on his vehicle; that the tires on his vehicle leave a specific overlap pattern because of the wear on them and that no such overlap pattern was found at the scene; that the underbrush on his vehicle did not match any brush from the area of the crime scene; that no fibers or hairs from the victim were found in his vehicle; that the fingerprints in his vehicle could have been left at any time before the day of the murder; that the enzyme from the blood stain on his shirt matches not only the victim but also 90% of the population; that the shirt from which the blood was taken was not properly stored and that the stain could come from any bodily fluid; that the tests performed on the blood stain produced inconclusive results, including the fact that the stain could have been a mixed stain of saliva and hamburger; that a news conference was held regarding his arrest twenty-four hours before the bay behind his house was searched, which provided ample time for someone to deposit the key and glass there; and that his two cellmates lied, gave inconsistent testimony, and received reduced sentences because of their testimony. Additionally, Suggs contended that both Ray Hamilton and Steve Casey, the victim's husband, could have committed the murder (with Casey having life insurance as a motive), and that those individuals were being pursued as suspects until his arrest, but as soon as he was arrested, police dropped their investigation of those suspects.

The State countered this defense by showing that the dock on which Suggs was purportedly working contained no new wood; that the tire tracks did in fact match Suggs' vehicle; and that the enzyme from the blood did not come from Suggs.

Suggs v. State, 644 So. 2d 64, 65-66 (Fla. 1994). Suggs was convicted of first-

degree murder, kidnapping, and robbery. Id. at 66.

- 3 -

We have previously summarized the penalty-phase evidence as follows:

> At the penalty-phase proceeding, one of Suggs' cellmates testified that Suggs told him he murdered the victim because he did not want to leave a witness. Additionally, the State entered into evidence a book entitled Deal the First Deadly Blow, which they had taken from Suggs' house. The State used this evidence to show that Suggs planned how he would kill the victim. The State also introduced evidence that Suggs was convicted of first-degree murder and attempted murder in 1979 and that he was on parole at the time of the murder in this case. Id. at 66.

After the penalty-phase proceeding, the jury recommended a death sentence by a seven-to-five vote, and the trial court sentenced Suggs to death, finding seven aggravating circumstances[1] and three mitigating circumstances.[2] Id.

---

1. The trial court found the following aggravating circumstances:

(1) A capital felony was committed by Suggs while under sentence of imprisonment; (2) Suggs was previously convicted of another capital felony and a felony involving the use or threat of violence to the person; (3) the crime for which Suggs is to be sentenced was committed while he was engaged in the commission of the crime of kidnapping; (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (5) the capital felony was committed for pecuniary gain; (6) the capital felony was especially heinous, atrocious, or cruel; (7) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

Suggs, 644 So. 2d at 66 n.1.

2. The trial court found the following mitigating circumstances:

(1) The capacity of Suggs to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially

We affirmed Suggs's conviction and death sentence on direct appeal. Id. Thereafter, we affirmed the denial of his initial motion for postconviction relief. Suggs v. State, 923 So. 2d 419 (Fla. 2005). Suggs now appeals the summary denial of his successive motion for postconviction relief, filed October 27, 2015, which raised five claims of newly discovered evidence or Brady[3] violations concerning the following matters: (1) allegations that the victim's husband, whom Suggs argued at trial may have murdered her, sexually abused the victim's daughter; (2) activities and statements of law enforcement officers involved in the search of the bay; (3) recent statements by Suggs's sentencing judge; (4) the involvement in Suggs's case of FBI analyst Michael Malone, whose work has been discredited in other cases; and (5) an investigation of the Walton County Sheriff's Department by the Florida Department of Law Enforcement (FDLE) during the period when Suggs was being investigated, along with evidence of misconduct by the Sheriff and Suggs's prosecutor in a contemporaneous case.

---

impaired (he had been drinking at the time of the incident); (2) Suggs' family background (he came from a good family); and (3) Suggs' employment background (he was a hard worker).

Id. at 66 n.2.

3. Brady v. Maryland, 373 U.S. 83 (1963).

- 5 -

## ANALYSIS

We review the circuit court's summary denial of each of these claims in turn, followed by a conclusion as to Suggs's argument that the cumulative effect of the new evidence requires a new trial, applying the de novo standard of review. Hunter v. State, 29 So. 3d 256, 261 (Fla. 2008). This standard requires us to accept the allegations of Suggs's motion as true to the extent that they are not conclusively refuted by the record and to uphold the circuit court's ruling if Suggs's claims are legally insufficient or their allegations are conclusively refuted by the record. See id.

### 1. Newly Discovered Evidence of the Husband's Motive

Suggs's first claim is based on information obtained from the victim's daughter relating to alleged sexual abuse of the victim's daughter by the victim's husband, whom Suggs argued at trial could have been the real murderer. To warrant relief, newly discovered evidence must "be of such nature that it would probably produce an acquittal on retrial." Jones v. State, 709 So. 2d 512, 521-22 (Fla. 1998). Suggs claims that the information concerning the alleged sexual abuse is newly discovered evidence of the victim's husband's motive for murdering her. However, Suggs's allegations do not indicate that the victim knew about the alleged sexual abuse of her daughter or provide any connection between the alleged abuse and a motive to murder the victim. Therefore, in a new trial, this information would be inadmissible as irrelevant and substantially more unfairly

prejudicial than probative.  See §§ 90.401, 90.403, Fla. Stat. (2017).  As a result, it would not "probably produce an acquittal on retrial," see Jones, 709 So. 2d at 521-22, and this claim was properly denied.

### 2.  **Brady Claim Concerning the Search of the Bay**

Suggs's second claim is presented under Brady v. Maryland, 373 U.S. 83 (1963), and concerns the discovery of the key during the search of the bay behind his house and information Suggs has recently obtained from Deputy Wyatt Henderson of the Walton County Sheriff's Department, who participated in the search as a diver.  The key was relevant not only because it fit a lock at the bar from which the victim was kidnapped, but also because a witness saw the victim place a key to that lock on the cash register earlier in the night, and no such key was found at the bar, among the victim's belongings, or on the victim in the investigation.

The search of the bay began on August 8, 1990, with the goal of finding the murder weapon, which was never recovered.  According to the trial evidence, the search was conducted methodically, with four divers positioned along a rope a few feet apart and moving in an arch pattern from a fixed point at one end of the rope and then extending the rope after completing a full sweep.  A drinking glass similar to the glasses used at the bar from which the victim was kidnapped was found on the first day.  That afternoon, Investigator Steve Sunday of the Walton County Sheriff's Department obtained a key from the bar owner, stating in his report that

the key would be "used to give the divers and other officers a description of the key to look for."  Henderson testified at trial that the dive team was not initially told to search for a key.

Testimony at trial established that the search of the bay continued on the morning of August 9, 1990, at the request of Captain Brad Trusty of the Walton County Sheriff's Department, even though the area had not been secured overnight on August 8, a press conference had been held naming Suggs as the suspect, Suggs's home was identifiable, and the bay was accessible to anyone.  For the second day, the team used one additional diver.  All the divers who testified, including Henderson, explained that on the morning of August 9, the search proceeded continuously from the area that had been searched the day before, except that the divers backed up and searched an overlapping segment of the bay due to poor visibility during the latter part of the prior day's search.  The bar key was found during the search of the overlapping section by the diver who was the farthest out into the bay.  That diver testified that the key was just beyond his position at the end of the rope.

In Suggs's successive motion for postconviction relief, he alleges that Wyatt Henderson has recently revealed that Captain Trusty told the dive team where in the bay to find the key; that Captain Trusty explained that Suggs had a water line on his pants during his interview, suggesting that evidence may be found farther out in the bay, even though Suggs was wearing black nylon shorts when he was

- 8 -

arrested; and that the divers were never shown the key that Investigator Sunday obtained on August 8. Suggs argues that this new information obtained from Henderson shows a <u>Brady</u> violation. We disagree because this information is not material under the <u>Brady</u> standard, which requires showing " 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " <u>Mordenti v. State</u>, 894 So. 2d 161, 170 (Fla. 2004) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999)). To meet this standard, a defendant must demonstrate that the suppressed evidence " 'could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict.' " <u>Id.</u> (quoting <u>Allen v. State</u>, 854 So. 2d 1255, 1260 (Fla. 2003)).

In reaching the conclusion that the information alleged to have been learned from Henderson is not material, we find it significant that Suggs's successive motion merely summarizes Henderson's recent statements, with no affidavit from Henderson. The successive motion does not purport to quote Henderson and in no way indicates that Henderson has recanted his trial testimony. Given these facts, the "new evidence" is clearly not material because it is consistent with the evidence at trial and would not be exculpatory.

First, Henderson is purported to have said—in Suggs's words—that Captain Trusty told the dive team where to find the key. Captain Trusty testified at trial that he requested the continuation of the search after the first day. Henderson and

others testified at trial that the search team essentially started back the second day where they had ended the search the night before, as darkness approached. Then, the team quickly found the key near where they had stopped the search the night before, either a little farther out (and therefore deeper) in the bay or in an overlap area which had been searched on the last pass of the prior evening when sunlight was diminishing and visibility was poor. Henderson is also alleged to have said that Trusty wanted the search to continue into deeper water because of a water line on Suggs's pants. Without a recantation of Henderson's trial testimony, which indicates a natural progression of the search in the normal course of an investigation, and only a summary of this "new" information in Suggs's words, we readily find these statements immaterial because they can be viewed in a manner that is completely consistent with the trial testimony and, without a recantation by Henderson, would necessarily have to be viewed that way. In fact, Suggs explains that, if Henderson had "been asked about why the search was expanded, he would have testified to the information conveyed to him by Captain Trusty."

With respect to the water stain, Suggs suggests that this statement (attributed by Henderson to Trusty) could not be true (and, therefore, could have been used to impeach Trusty), either because a water stain could not be seen on black fabric or because a water line would not have reached the fabric of shorts. The first inference cannot form a basis for relief because it is too speculative. Seawater contains salts and "other substances, including dissolved inorganic and organic

materials" and particulates, Fred T. Mackenzie, et al., <u>Seawater</u>, Encyc. Britannica, http://www.britannica.com/science/seawater (last visited October 30, 2017), and salt dissolved in water crystallizes and remains behind as the hydrogen dioxide evaporates, <u>see</u> Noushine Shahidzadeh et al., <u>Salt stains from evaporating droplets</u>, Scientific Reports (2015), http://www.nature.com/articles/srep10335 (last visited October 30, 2017) (studying stain patterns left through this commonly observed phenomenon). Further, depending on the composition of the bay water at the relevant location and time, it is possible that other solids would also remain after evaporation of the hydrogen dioxide, and either salt or other solids could be visible on dark fabric. With respect to both inferences, even Suggs admitted that he had been in the bay, in his clothing, the night of his arrest—which is how the money found in his home became wet (indicating that he would have been deep enough for the water to reach the pockets of his pants). Additionally, because Captain Trusty did not testify one way or the other about a water line, any impeachment value of this evidence would have to follow questioning by Suggs of Captain Trusty as to the reason he ordered the search to continue on the second day. To determine whether this questioning would have any impeachment value at all, we would have to speculate as to how it would progress. Therefore, the impeachment value of the water-line information does not create a reasonable probability of a different outcome. <u>Cf.</u> <u>Wright v. State</u>, 857 So. 2d 861, 870 (Fla. 2003) (finding

no <u>Brady</u> violation where "the exculpatory effect" of the evidence was "merely speculative").

The fact that the bar key obtained by Investigator Sunday was not shown to the search team of divers is similarly immaterial because it is consistent with the trial testimony. No one at trial testified that the key was shown to the divers, and the jury was aware that Investigator Sunday obtained a key from the bar owner the day before a key was found in the bay. And, Investigator Sunday's report does not say that he intended to show the divers the key; it states that he obtained the key to give the divers a description, and it notes the physical characteristics of the key as being silver with a round head.

In short, Suggs's new allegations concerning the key are consistent with the explanation of the search presented at trial and, therefore, our confidence in the verdict is not undermined. <u>See</u> <u>Mordenti</u>, 894 So. 2d at 170 (explaining that alleged <u>Brady</u> evidence is material only if it is of such a nature that it " 'could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict' " (quoting <u>Allen</u>, 854 So. 2d at 1260)). Accordingly, this claim was properly denied.

### 3. Newly Discovered Evidence Concerning Sentencing Judge

Suggs's third claim is that newly discovered evidence reveals that his sentencing judge failed to exercise her independent judgment over the decision to sentence him to death under the law as it existed when he was sentenced. Suggs

quotes statements his sentencing judge made in a memoir and a letter to the Governor in support of commuting Suggs's sentence to life, arguing that she not only deferred to the jury's vote, contrary to section 921.141(3), Florida Statutes (1989), and Ross v. State, 386 So. 2d 1191 (Fla. 1980), but also that she shifted her responsibility to the appellate court, contrary to Caldwell v. Mississippi, 472 U.S. 320 (1985). This claim is meritless. Suggs's sentencing judge issued a detailed order showing the requisite findings, and her recent revelation of her thought process at the time is not the type of evidence that would probably change the outcome at a new sentencing proceeding, as it would not be admissible evidence. See Marek v. State, 14 So. 3d 985, 990 (Fla. 2009) (requiring that newly discovered evidence related to sentencing be of such a nature that it would "probably yield a less severe sentence"). Moreover, the sentencing judge's thought process inhered in her decision and is not subject to review. Cf. Foster v. State, 132 So. 3d 40, 64-65 (Fla. 2013) (explaining that jurors' private thoughts inhere in the verdict). For these reasons, Suggs's claim is distinguishable from cases where relief has been warranted due to postconviction revelations that prosecutors drafted sentencing orders imposing death without input from the sentencing judges or after ex parte communications. See Roberts v. State, 840 So. 2d 962, 972-73 (Fla. 2002) (ex parte communication); Card v. State, 652 So. 2d 344, 345-46 (Fla. 1995) (lack of input). Accordingly, this claim was properly denied.

### 4. <u>Brady</u> Claim Concerning FBI Agent Malone

Suggs's fourth claim is that the State committed a <u>Brady</u> violation by using FBI Agent Michael Malone to test evidence for Suggs's case and not notifying Suggs when Malone was later investigated and found to have performed unreliable work in numerous cases. This claim, too, fails the <u>Brady</u> materiality requirement. Malone concluded that none of the hair found on the victim's body matched Suggs's hair, and Suggs was aware of this conclusion at the time of trial. Given that Malone did not testify in Suggs's trial, that Malone did not provide any evidence inculpating him, and that Suggs has not provided a non-speculative reason to believe that any hair other than the victim's was found on the victim's body, there is no reasonable probability that Suggs's allegations concerning Malone would have produced a different verdict. Therefore, our confidence in the verdict is not undermined. See <u>Bolin v. State</u>, 184 So. 3d 492, 500-01 (Fla. 2015) (holding that Malone's contamination of evidence in a separate case was not relevant in a case where Malone had the limited role of receiving evidence, checking for hair and fibers, and forwarding the evidence to other examiners and did not testify), <u>cert. denied</u>, 136 S. Ct. 790 (2016); <u>Rhodes v. State</u>, 986 So. 2d 501, 506-08 (Fla. 2008) (finding a lack of <u>Brady</u> materiality in the revelation that Malone falsely testified that hairs in the victim's hand belonged to the victim, where postconviction testing was unable to exclude either the victim or the defendant as the source of the hair). Accordingly, this claim was properly denied.

### 5. <u>Brady</u> Claim Concerning Misconduct of Sheriff's Department and Prosecutor

Suggs's fifth claim is that the State committed a <u>Brady</u> violation by failing to disclose that the FDLE was investigating the Walton County Sheriff's Department for misconduct during the period when Suggs was being investigated and prosecuted and that, according to testimony from collateral proceedings in another case, both the Sheriff and the assistant state attorney who prosecuted Suggs engaged in misconduct in a contemporaneous case.[4] If Suggs had known of the FDLE's investigation or the alleged misconduct by the Sheriff and prosecutor, that knowledge does not undermine our confidence in the verdict, as the related evidence would not have been admissible at Suggs's trial as either substantive or impeachment evidence. <u>See</u> §§ 90.404(1), (2)(a), Fla. Stat. (1989) (providing that evidence is inadmissible when its sole relevance is to prove bad character or propensity); <u>Bogle v. State</u>, 213 So. 3d 833, 840 (Fla.) (recognizing that "particular acts of misconduct" are inadmissible for impeachment purposes), <u>petition for cert. filed</u>, No. 17-6329 (U.S. Sept. 7, 2017). Accordingly, this claim was properly denied.

---

4. Suggs has not alleged that the FDLE found misconduct in either his case or the contemporaneous case.

### 6. Cumulative Effect of the New Allegations

Finally, Suggs argues that when all the allegations presented in this postconviction proceeding are considered cumulatively with the trial evidence and other admissible evidence developed in prior postconviction proceedings, he is entitled to a new trial. We disagree. As explained above, the only additional evidence presented in this proceeding potentially admissible in any retrial is that regarding the key addressed in claim two, and there is no reasonable probability that, had this evidence been disclosed to the defense, the result of the trial would have been different. Therefore, our confidence in the verdict is not undermined.

### CONCLUSION

For the foregoing reasons, we affirm the summary denial of Suggs's successive motion for postconviction relief.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and LAWSON, JJ., concur.
NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Walton County,
    Kelvin Clyde Wells, Judge - Case No. 661990CF000338CFAXMX

Robert S. Friedman, Capital Collateral Regional Counsel, Dawn B. Macready, and Stacy Biggart, Assistant Capital Collateral Regional Counsel, Northern Region, Tallahassee, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Lisa A. Hopkins, Assistant Attorney General, Tallahassee, Florida,

    for Appellee