# Supreme Court of Florida

_____

No. SC19-1512

_____

**BILLY JIM SHEPPARD, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC20-422

_____

**BILLY JIM SHEPPARD, JR.,**
Petitioner,

vs.

**RICKY D. DIXON, etc.,**
Respondent.

March 10, 2022

PER CURIAM.

Billy Jim Sheppard, Jr., appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and sentence of death filed under Florida Rule of Criminal

Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. *See* art. V, § 3(b)(1), (9), Fla. Const.

In the proceedings below, the circuit court granted a new penalty phase and the State has not challenged that ruling. Therefore, only postconviction claims relevant to the guilt phase issues are presented on appeal. Sheppard's petition for writ of habeas corpus raises two claims of ineffective assistance of appellate counsel. For the reasons explained below, we affirm the circuit court's order and deny the petition for writ of habeas corpus.

## BACKGROUND

Sheppard was convicted of the first-degree murders of Monquell Wimberly and Patrick Stafford. *See Sheppard v. State*, 151 So. 3d 1154, 1157 (Fla. 2014). The jury recommended the death penalty for the murder of Wimberly by a vote of eight to four and life imprisonment without the possibility of parole for the murder of Stafford. *Id.* at 1164. The trial court followed the jury's recommendations. *Id.* We affirmed both convictions and the sentence of death on direct appeal, *id.* at 1157, and summarized the relevant facts as follows:

Dtalya Barrett, a security guard at the Hollybrook Apartments on King Street in Jacksonville, testified that on the morning of July 20, 2008, she was working at the apartment's entrance gate. When she heard gunshots shortly after 10 a.m., she ran to the end of the sidewalk where she saw a person holding a gun out of the passenger side window of a passing car driving toward her. The person holding the gun shot a teenage boy, later identified as sixteen-year-old Monquell Wimberly, who was riding a bicycle. Barrett ran to call police and when she returned, she saw the shooter leaning out of the car window and looking back toward the boy on the ground. She could not see the driver but could see the passenger quite well from about ten to twelve feet away, and she said the shooter was a black male with "dreads." When the police arrived, she was placed in the police car to wait but "ran off" because, as she explained, the police put her where everyone could see her and "they didn't think about whether he can come kill us or whatever . . . . I wanted to get out and get my kids and leave." . . .

Barrett did meet with detectives the next day and was shown a series of photographs on the computer. She initially picked out one person as "looking like" the shooter, and although police investigated that person, he was not arrested. When Barrett met again with detectives and was shown more photographs she picked out Sheppard's photograph, and she identified Sheppard in court as the man she saw shoot Wimberly. She also identified Dorsette James's stolen car as matching the vehicle in which the shooter was riding.

Khalilah Mejors, a resident at the Hollybrook Apartments, was standing on the third-floor balcony on the morning of July 20, 2008, and saw the young man riding the bicycle. She testified that as a dark gray Ford Crown Victoria or Mercury vehicle approached the boy and slowed down, the boy put his hands in the air and was immediately shot, and he was shot several more

times while on the ground. She could not see the shooter's face or that of the driver but did see the lower part of an arm sticking out of the passenger side window holding the gun. She ran to the victim and found him still alive but not speaking.

Kieva Sherrod was also a resident at the Hollybrook Apartments on July 20, 2008, where she lived on the third floor facing King Street. She was standing on the balcony with her cousin Khalilah Mejors that morning and also saw Wimberly ride by on a bicycle toward the entrance to the apartment complex. She saw the vehicle, which looked like a gray Ford Crown Victoria, drive up to the person on the bicycle and slow down, and the boy on the bicycle stopped. She testified that she sat down, but heard a gunshot and when she looked again, the boy on the bicycle had his hands up in the air. She saw a gun pointed out of the window of the car, but she could not see who was holding the gun, although she could see that there were two people in the car. Sherrod testified that the boy was shot several more times and fell off the bicycle. She ran inside to get her phone to call the police and then ran down to the boy to see if he was still alive. She said he was still alive but she did not hear him say anything. She identified a photograph of the car, which witnesses later identified as one stolen from Dorsette James at the Prime Stop convenience store, as the car she saw that morning.

Approximately one and a half hours before Wimberly was shot, a car matching the description of the Wimberly shooter's car was stolen at gunpoint from Dorsette James at the Prime Stop Food Store. Willie Lee Carter, Jr., testified that he was at the store with James, who was since deceased. Carter, who was outside but not in the vehicle, heard James exit the store and say, "Man, don't do it like that." When Carter looked, he saw two men getting into James's car, a gray Crown Victoria. One man, described as shorter and with light brown skin

- 4 -

and dreadlocks, got into the driver's side of the car. The other person, a tall man with darker skin, got in the passenger side and the car drove away. When Carter asked James why he let them take his car, Carter testified that James told him one of the men had a gun. James later picked Sheppard's photograph out of a photographic array as the driver and a photograph of Rashard Evans as the person who got into the passenger side of the car. Photographs taken from inside the Prime Stop store showed both Evans and Sheppard at the store that morning.

The stolen car was recovered that evening near where the shooting occurred, but no DNA was found for comparison purposes. Latent fingerprints and palm prints taken from the stolen car were submitted for examination and comparison. Fingerprint examiner Richard Kocik of the Jacksonville Sheriff's Office testified that some of the fingerprints taken from the stolen car were of no value and were not compared to anyone. The only prints of value taken from the vehicle, palm prints and some fingerprints, matched Rashard Evans.

. . . .

Before Detective [Bobby] Bowers[, Sr.] arrived to investigate the Wimberly shooting scene on King Street on July 20, 2008, he had been investigating the shooting of Patrick Stafford, which occurred at 6 a.m. that same morning on Academy Street in Jacksonville. Shamika Worthey lived on Academy Street and, in the early morning hours of July 20, 2008, went out to her car to retrieve some diapers and saw Patrick Stafford asleep in her brother's car. She returned to the house and went back to sleep but was awakened by the sound of gunshots at about 5:30 or 5:45 a.m. She could not see anything from the window and woke her uncle and brother and asked if Stafford had a gun and was told he did not. She looked again and could then see that

Stafford was lying by a tree in the yard. He appeared to have blood on his shirt.

Leporyon Worthey . . . testified that he and Patrick Stafford, his cousin, arrived at the house on Academy Street after midnight and that he went to bed around 3 a.m., leaving Stafford sitting on the hood of Leporyon's car waiting for a ride. When his sister woke him around 6 a.m., Leporyon found Stafford on the ground, with the car door open and no one else present. Leporyon said Stafford tried to speak but could not do so. Crime scene detective Howard Mac Smith was dispatched to the Academy Street scene and found a Ford LTD parked in the yard with the door open and the passenger side window shattered. Stafford's body was near the car and shell casings found around the area were collected for forensic examination.

*Id.* at 1158-60 (footnote omitted).

Sheppard was taken into custody and after being read and waiving his *Miranda*[1] rights, he was interviewed by Detective Bowers and Detective Glen Warkentien.[2] *Id.* at 1161. Sheppard initially denied carjacking James's car, but he later admitted that he and Evans took the car for a "joyride." *Id.* Sheppard maintained that he got into the driver's side and that he later got out of the car

---

1. *Miranda v. Arizona*, 384 U.S. 436 (1966).

2. A redacted form of the video of the interview was played for the jury; Sheppard's trial counsel did not object to its admission at trial. *Sheppard*, 151 So. 3d at 1161.

while Evans kept it. *Id.* Sheppard denied taking the car by force and denied any involvement with the Wimberly or Stafford murders. *Id.*

Sheppard's cellmate, Michael Roberts, gave the following testimony:

> Roberts testified that at one point during their incarceration, Sheppard asked him how much weight an eyewitness's testimony would be given if that witness identified Sheppard as the shooter, but there was no other evidence. Roberts testified that he told Sheppard the testimony would be crucial. Roberts testified that Sheppard also asked how much weight it would carry if a codefendant related facts of a crime to a third party when the other codefendant was not present. Roberts said he asked about it and Sheppard told him Evans, his codefendant, was housed on the other side of the jail and was bragging about a carjacking, saying "the guy bucked and that they shot him," referring to the Stafford murder. Roberts said that when Sheppard was explaining why he was charged with murder, Sheppard said his codefendant Evans had talked and it got back to the police, who then matched the ballistics from the two shootings.

> Roberts testified, "Actually he said that—he said that they were going hard [apparently a reference to doing drugs] and they were trying to find a car and that they went to rob a guy for his car and he bucked. They were trying to take a car from him and he bucked," which meant he was not giving up the car. "So he said that him and Rashard shot him . . . . He said they both put fire on him," which meant shooting him. Roberts also testified that he overheard Sheppard telling some other inmates that, later on the day of the carjacking attempt, they "shot that [expletive] from West Jax that was on his bike"

- 7 -

and with whom Sheppard said he had argued. Roberts explained that Sheppard said he had been in a big argument a few days before with "some boys from West Jax because [Sheppard] and [his associate] Dirt, they're from Paxon and PYC," which are gang references.

Roberts testified that Sheppard later told him directly about shooting the boy on the bicycle after he and Evans had shot the man who "bucked" in the attempted carjacking earlier that morning. Roberts testified, "And he said that he pulled up to him and he was on a bicycle. And they slowed down and he hung his arm out the window and started shooting. And he said the dude looked at him and was, like—(demonstrating)— and shot. And he said he went ahead and shot him. He didn't say how many times." Roberts testified that Sheppard then described the woman who could identify him:

> And then he said whenever they—he shot the guy. He looked up when they were pulling away, and there was a lady looking right in his face. And he said it was just—and I was like: Well, why didn't you—you know, why didn't you shoot her? Basically I said that. And he was like: Oh, I wish I would have killed her. He said because it was—I guess the way he put it was when they were pulling—when he looked up—after he shot the guy, he looked up and she was looking at him but Rashard was already pulling away.

Roberts testified that Sheppard told him Evans would not testify against him, but Sheppard was worried about the woman who could identify him.

Roberts also testified that at the point when his own charges were about to be dropped, Sheppard asked him for a favor. When Roberts asked what the favor was,

Sheppard said, "Man, you know, if she don't come and testify on me, they ain't got no case. You told me yourself . . . [y]ou said, man, if she don't come testify, they ain't got no case on me at all, other than what my codefendant told that other guy." Roberts said Sheppard told him he would get all the information to Roberts through Sheppard's sister and could pay him with his income tax return. Roberts said he did not want to look weak so he said he would think about it, but never gave Sheppard an answer. Roberts said Sheppard asked him several times after that what he was going to do, and then Sheppard was moved out of the jail dorm. Roberts testified, "He wanted me to kill her." Roberts further testified that he never told law enforcement about this information while his own charges were still pending in Duval County and that he was not promised anything for his testimony, although he later divulged the information in hopes of a reduced sentence on subsequent charges in Nassau County. He testified that he pled guilty to those charges and, at the time of trial, was facing a possible sentence of thirty years in prison.

*Id.* at 1161-62.

The medical examiner who performed the autopsies on Stafford and Wimberly opined at trial that the cause of death for both victims was multiple gunshot wounds. *Id.* at 1160. Though no firearms were recovered, David Warniment, a firearms examiner for the Florida Department of Law Enforcement, examined and compared bullets and shell casings from both the Stafford and Wimberly shootings. *Id.* at 1160-61. Warniment testified that two firearms were used to shoot Stafford and that one was used to

- 9 -

shoot Wimberly; he testified that "two bullets recovered from Stafford's body were fired from the same Smith and Wesson 9mm caliber pistol that fired three bullets recovered from Wimberly's body." *Id.* at 1161.

On direct appeal, Sheppard challenged his convictions for both murders and his sentence of death for Wimberly's murder, raising five issues: (1) the admission of Sheppard's videotaped confession was fundamental error; (2) the trial court erred in admitting the out-of-court statement by Evans to Evans's girlfriend, which elicited a response from Sheppard that implicated him; (3) the admission of Barrett's testimony about her fear of the shooter "constituted fundamental error in that it inflamed the minds of the jurors, violated the prohibition against a 'Golden Rule' argument, and was an improper attack on Sheppard's character by suggesting a propensity for violence"; (4) the trial court's handling of juror misconduct or premature deliberation amounted to fundamental error; and (5) Sheppard's sentence of death was not proportionate. *Id.* at 1165-75.

We rejected each claim and concluded that there was sufficient evidence to sustain Sheppard's convictions. *Id.* at 1165-

76. Accordingly, we affirmed Sheppard's convictions for both murders and his sentence of death for Wimberly's murder. *Id.* at 1175-76.

In April 2016, Sheppard timely filed the initial rule 3.851 motion at issue in this postconviction appeal. He raised the following claims: (I) his death sentence violates *Atkins v. Virginia*, 536 U.S. 304 (2002), and Florida's constitutional prohibition against cruel and unusual punishment because he is intellectually disabled; (II) ineffective assistance of counsel during jury selection for (a) failing to question prospective jurors about aggravating and mitigating circumstances, (b) failing to conduct a meaningful death qualification, (c) failing to inquire about racial bias, (d) failing to ensure the jury was properly instructed of its role during the penalty phase, and (e) failing to object to a *Batson*[3] violation; (III) ineffective assistance of counsel during the guilt phase for (a) failing to present an insanity defense, (b) failing to present a competent misidentification defense, (c) failing to effectively cross-examine Barrett, (d) failing to hire a crime scene reconstructionist, (e) failing

---

3. *Batson v. Kentucky*, 476 U.S. 79 (1986).

- 11 -

to make proper objections, (f) failing to file a motion in limine to exclude the videotaped interrogation of Sheppard, (g) failing to challenge the State's ballistics evidence, and (h) failing to investigate jury misconduct; (IV) newly discovered evidence of Roberts's recantation of his trial testimony; (V) *Brady* and *Giglio*[4] violations for withholding information of deals that the State made in exchange for Roberts's and Willie Carter's trial testimony; (VI) prosecutorial misconduct for presenting evidence of gang affiliation despite disclosing to trial counsel that the State did not intend to argue Sheppard's gang affiliation as an aggravating circumstance; (VII) ineffective assistance of counsel at the penalty phase for (a) failing to conduct a competent mitigation investigation and failing to present mitigation, (b) failing to ensure a competent mental health evaluation, (c) failing to establish and argue statutory mitigators, (d) stipulating to an aggravating circumstance, (e) failing to object to improper jury instructions, and (f) failing to object to the State's improper closing argument; (VIII) trial counsel failed to retain a qualified mental health expert in violation of *Ake v. Oklahoma*, 470

---

4.  *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

U.S. 68 (1985); (IX) due process violations because (a) trial counsel was overextended and failed to provide adequate representation and (b) trial counsel lost or destroyed Sheppard's trial records, thereby prohibiting postconviction counsel from adequately investigating and pleading claims; (X) cumulative error; (XI) Florida's capital sentencing procedure violates *Hurst v. Florida*, 577 U.S. 92 (2016), and the Sixth and Eighth Amendments to the United States Constitution; and (XII) the death penalty is cruel and unusual because (a) Florida cannot maintain a sufficient supply of drugs to administer lethal injection and (b) Florida's use of midazolam as the first drug in its three-drug protocol is unconstitutional. Sheppard later filed a motion to amend and add three claims; the trial court allowed him to include the following two claims: (XIV) newly discovered evidence that Mejors was smoking marijuana and not wearing her glasses when she witnessed Wimberly's murder; and (XV) the State committed *Brady* and *Giglio* violations by failing to disclose that Mejors was not wearing her glasses when she witnessed Wimberly's murder.

The State conceded that Sheppard is entitled to a new penalty phase under *Hurst v. Florida* and *Hurst v. State*, 202 So. 3d 40 (Fla.

2016), *overruled in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020), and the circuit court granted a new penalty phase and dismissed the remaining penalty phase claims as moot, and Sheppard withdrew several claims. The circuit court conducted an evidentiary hearing for the remaining claims that involved a factual dispute, at which several individuals were called to testify, including Sheppard's trial counsel, W. Charles Fletcher, and the assistant state attorney who represented the State at trial, Mark Caliel. After the evidentiary hearing, the circuit court entered an order denying Sheppard's motion for postconviction relief on August 5, 2019.

This appeal follows. On appeal, Sheppard argues that the circuit court erred by denying: (A) varied claims of ineffective assistance of trial counsel; (B) two newly discovered evidence claims; (C) several *Brady* and *Giglio* claims; and (D) a claim of cumulative error. We address Sheppard's postconviction appeal first, followed by his petition for writ of habeas corpus, in which Sheppard alleges that his appellate counsel was ineffective on direct appeal in two respects.

# ANALYSIS

## I. POSTCONVICTION APPEAL

### A. Ineffective Assistance of Counsel Claims

To demonstrate ineffective assistance of counsel, a defendant

must show the following:

> First, counsel's performance must be shown to be
> deficient. *Strickland v. Washington*, 466 U.S. 668, 687
> (1984). Deficient performance in this context means that
> counsel's performance fell below the standard guaranteed
> by the Sixth Amendment. *Id.* When examining counsel's
> performance, an objective standard of reasonableness
> applies, *id.* at 688, and great deference is given to
> counsel's performance. *Id.* at 689. The defendant bears
> the burden to "overcome the presumption that, under the
> circumstances, the challenged action 'might be
> considered sound trial strategy.' " *Id.* (quoting *Michel v.
> Louisiana*, 350 U.S. 91, 101 (1955)). This Court has
> made clear that "[s]trategic decisions do not constitute
> ineffective assistance of counsel." *See Occhicone v. State*,
> 768 So. 2d 1037, 1048 (Fla. 2000). There is a strong
> presumption that trial counsel's performance was not
> ineffective. *See Strickland*, 466 U.S. at 669.

> Second, the deficient performance must have
> prejudiced the defendant, ultimately depriving the
> defendant of a fair trial with a reliable result. *Strickland*,
> 466 U.S. at 689. A defendant must do more than
> speculate that an error affected the outcome. *Id.* at 693.
> Prejudice is met only if there is a reasonable probability
> that "but for counsel's unprofessional errors, the result of
> the proceeding would have been different. A reasonable
> probability is a probability sufficient to undermine
> confidence in the outcome." *Id.* at 694. Both deficient
> performance and prejudice must be shown. *Id.* Because

both prongs of the *Strickland* test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo.

*Bradley v. State*, 33 So. 3d 664, 671-72 (Fla. 2010).  Because *Strickland* requires a defendant to establish both prongs, if one prong is not met, the Court need not reach the other.  *Stewart v. State*, 801 So. 2d 59, 65 (Fla. 2001).  However, "[w]here trial counsel is deficient in more than one area . . . we must 'consider the impact of these errors cumulatively to determine whether [the defendant] has established prejudice.' "  *Sparre v. State*, 289 So. 3d 839, 847 (Fla. 2019) (quoting *Parker v. State*, 89 So. 3d 844, 867 (Fla. 2011)).

**(1) Failure to Effectively Present a Misidentification Defense**

Sheppard first challenges the circuit court's denial of his claim that his trial counsel was ineffective in presenting a misidentification defense because counsel (a) failed to retain a witness identification expert to opine on the credibility of eyewitness identification; (b) failed to investigate and present to the jury eyewitness accounts of the shooting that differed from Barrett's

- 16 -

account; and (c) failed to effectively challenge the photo lineup that the Jacksonville Sheriff's Office (Sheriff's Office) presented to eyewitnesses. We affirm the circuit court's finding that trial counsel was not deficient in the presentation of a misidentification defense.

**(a) Witness Identification Expert**

Barrett was the only witness who identified Sheppard as the shooter in the Wimberly murder. She observed the shooter for four or five seconds and made "clear and strong eye contact" with him as he was leaning out of the passenger side window of a moving vehicle while holding a gun. She selected his photograph out of a photospread shortly after the shooting and she identified him at trial. At trial, Barrett and several other witnesses testified that she was extremely stressed during the shooting, in part because she initially believed that the victim was her nephew. Sheppard argues that there is a reasonable probability that the result of the proceedings would have been different if trial counsel had retained an eyewitness identification expert to educate himself or the jury about the factors that may affect eyewitness identification.

Sheppard's trial counsel testified at the evidentiary hearing that, though the main theory of defense at trial was

- 17 -

misidentification, he believed the inconsistencies in Barrett's identification of Sheppard as the shooter were not significant and that any testimony that a witness identification expert could give would be "common sense" and would ultimately be of little use because it could not be used to identify anyone other than Sheppard as the shooter. Moreover, trial counsel testified that Sheppard confessed to him that he was the shooter and trial counsel was concerned an eyewitness expert would bolster Barrett's identification.[5]

We agree with the circuit court's conclusion that trial counsel's strategic decision not to retain an identification expert was not deficient performance. *See Pietri v. State,* 935 So. 2d 85, 85 (Fla. 5th DCA 2006) (concluding that a trial court did not abuse its discretion in denying a claim of ineffective assistance of counsel for failing to retain an eyewitness expert because the expert's testimony related to common sense problems with eyewitness identification). As noted, Sheppard confessed to trial counsel that he was the shooter, and trial counsel was understandably concerned that

---

5. Trial counsel testified that Sheppard told him that "there's no way that bitch [meaning Barrett] could have seen me."

additional testimony about issues with Barrett's identification—issues that the jurors could have relied on their common sense to resolve—could potentially produce information damaging to his client.

Moreover, though the circuit court did not address prejudice with respect to this subclaim, in light of the other evidence of guilt in the case—including ballistic evidence matching a firearm from both shootings; witness testimony that Sheppard and Evans stole Jones's car, which matched the description of the car used during the Wimberly shooting; and Sheppard's video confession to stealing Jones's vehicle—there is no reasonable probability that but for trial counsel's failure to retain an identification expert the result of the proceeding would have been different.

Therefore, we affirm the circuit court's denial of relief.

**(b) Eyewitness Accounts**

There were several discrepancies in eyewitness descriptions of the car that was used during the shooting. Barrett vacillated on the position of a sticker on the back window of the car and ultimately identified James's car, which did not have a sticker on the back window, as the one used during the shooting. Sheppard argues

that his trial counsel was ineffective for failing to investigate and call witnesses to bring out inconsistencies in Barrett's testimony that would have rebutted Barrett's identification of Sheppard as the shooter.

At the postconviction evidentiary hearing, Sheppard presented several witnesses whose descriptions of the car used during the shooting varied as to the color of the car and type of license plate. At the hearing, trial counsel conceded that there were slight variations in eyewitness descriptions of the car used during the shooting and that it may have been important to bring out Barrett's prior inconsistent statements, but he maintained they were insignificant and did not overcome the overall consistencies in eyewitness descriptions of the car and Barrett's identification of Sheppard at trial.

We agree with the circuit court's conclusion that trial counsel's failure to challenge Barrett's description of the car and to investigate and call certain witnesses at trial to rebut Barrett's testimony did not fall below the standard guaranteed by the Sixth Amendment. As trial counsel explained, attempting to challenge slight inconsistencies among witness descriptions of the car would

have highlighted the overall consistency in their identification of Sheppard. Moreover, the circuit court cited competent, substantial evidence in support of its determinations that the eyewitness testimony offered at the postconviction evidentiary hearing, including by Avery Evans, Asia Ramsey Iszard, and Ava Webb, either failed to contradict Barrett's account of the murder, corroborated Barrett's account, or was not credible. Credibility determinations are the province of the trial court and will not be disturbed so long as they are supported by competent, substantial evidence, as they are in this case. *See Foster v. State*, 929 So. 2d 524, 537 (Fla. 2006) (explaining that the trial court is in a better position to judge the credibility of witnesses).

Therefore, we affirm the circuit court's denial of relief.

### (c) Photospreads

Sheppard argues that the Sheriff's Office did not follow its own procedures in administering the photospread to Barrett. Namely, the officer failed to show the photos to Barrett one at a time and failed to document her witness statement verbatim. Sheppard argues that he was prejudiced by trial counsel's failure to challenge Barrett's identification during the photo lineup.

Because nothing in the record shows that the Sheriff's Office breached its own procedure, the circuit court correctly concluded that trial counsel's performance was not deficient when he decided to refrain from questioning Barrett on this point. Postconviction counsel argued below and on appeal that trial counsel was deficient for not challenging the failure of the Sheriff's Office to document Barrett's statement verbatim, but counsel does not explain how that failure would have affected the credibility of Barrett's identification. Therefore, this claim is speculative and cannot succeed. *See Bradley*, 33 So. 3d at 672.

Even if this claim was not speculative, trial counsel's performance was not deficient. Sheppard argues that trial counsel was deficient when he failed to challenge Barrett's identification during the photo lineup. This argument ignores the fact trial counsel actually did challenge the validity of Barrett's identification when he suggested that she may have remembered Sheppard's face from the "mugbook" that she was shown earlier. Trial counsel cannot be deemed ineffective for failing to challenge Barrett's identification because he actually did so during trial. *See Bates v.*

*State*, 3 So. 3d 1091, 1106 n.20 (Fla. 2009) ("[C]ounsel cannot be held ineffective for what counsel actually did . . . .").

Therefore, this claim was properly denied.

**(2) Failure to Effectively Cross-Examine Barrett**

Sheppard next challenges the circuit court's denial of his claim that trial counsel was ineffective for failing to cross-examine Barrett on four alleged inconsistencies between her trial testimony and her previous statements, namely (a) her evolving description of the shooter; (b) her evolving description of the vehicle used during the shooting; (c) whether she had seen the shooter and the vehicle in the apartment complex prior to the shooting; and (d) whether she knew the victim. We affirm the circuit court's denial of relief with respect to each of these claims.

**(a) Evolving Description of the Shooter**

Sheppard argues that Barrett's description of him was inconsistent with his appearance at the time of the shooting and that trial counsel was ineffective for failing to challenge Barrett regarding discrepancies in her description of the shooter's hairstyle.

When Barrett initially spoke to the police, shortly after the shooting, she described the shooter as having a short haircut.

Later, at her deposition, she described the shooter as having long plaits, although she stated that she could not really tell how long his hair was. Then finally at trial, Barrett testified that the shooter had dreads that did not go past his shoulders.

At the evidentiary hearing, trial counsel testified that he would bring to the jury's attention changes in a witness's description of the shooter if the changes were significant. Trial counsel further testified that he was concerned that pressing Barrett as to certain aspects of her identification of Sheppard as the shooter would only provide her with an opportunity to reiterate her certainty that Sheppard was the shooter.

The circuit court found that "Barrett's description to the police of the shooter as having short hair is consistent with the picture of [Sheppard] with a short haircut and tight dreadlocks" that Barrett picked out of the photospread in identifying Sheppard as the shooter, and further ruled that trial counsel's "strategy was reasonable in light of the insignificance of the different descriptions of [Sheppard's] hairstyle." Even if Barrett's prior descriptions of the shooter's hairstyle had been admissible as prior inconsistent statements, *see Wilcox v. State*, 143 So. 3d 359, 383 (Fla. 2014)

- 24 -

(holding that a prior statement is inconsistent only if it directly contradicts or materially differs from the trial testimony) (citing *State v. Smith*, 573 So. 2d 306, 313 (Fla. 1990)), we agree with the circuit court's conclusion that trial counsel's decision to refrain from challenging Barrett on her prior descriptions of the shooter's hairstyle was reasonable. The record shows that trial counsel's strategy was not to challenge insignificant changes to Barrett's description of the shooter that would give Barrett the opportunity to reiterate to the jury her identification of Sheppard as the shooter.

Because reasonable strategy decisions do not constitute deficient performance, we affirm the denial of relief.

### (b) Evolving Description of the Vehicle

Sheppard next argues that trial counsel was ineffective in cross-examining Barrett regarding her inconsistent descriptions of the vehicle used in the shooting, which he contends would have shown that the vehicle Barrett described did not match the vehicle stolen by Sheppard. Barrett testified at trial that she could not provide specific details relating to the vehicle's tag, but that she could describe what the back of the vehicle looked like. Barrett also

stated that a white decal appeared on the back rearview window of the vehicle used in the shooting.

The circuit court concluded that Barrett's inability to provide specific details relating to the vehicle's tag did not amount to an inconsistent statement, and that it was simply a gap in knowledge. As for the differing statements regarding the decal, the circuit court concluded that the decal was a minor detail and that it did not undermine Barrett's trial testimony; therefore, trial counsel was not deficient for failing to question her on this point.

The record shows that trial counsel made reasonable strategic decisions not to challenge Barrett's descriptions because he did not want to potentially introduce more damaging evidence against Sheppard, who had confessed to the shooting, or highlight the consistencies between the descriptions of the car provided by Barrett and other witnesses.

Accordingly, because Sheppard failed to establish deficient performance, we affirm the circuit court's denial of relief.

### (c) Previous Sightings of Shooter at Hollybrook Apartments

At the evidentiary hearing, Sheppard argued that trial counsel was deficient for failing to impeach Barrett with her prior inconsistent statements regarding her having previously seen Sheppard at Hollybrook Apartments.

Barrett had initially told police that she knew the shooter and had seen his car around the complex before the shooting. She suggested that they check the security logs to try to identify the car. However, she later recanted and told police that she had fabricated that statement because she was afraid of retribution. Sheppard contends that his trial counsel should have used Barrett's initial statement to impeach her.

We agree with the circuit court's conclusion that trial counsel's strategic decision not to impeach Barrett with her prior statement was reasonable and therefore not deficient. Cross-examining Barrett regarding these statements would have provided her an opportunity to reiterate her certainty that Sheppard was the shooter and potentially to articulate before the jury facts supporting a reasonable fear of retribution from him. Trial counsel made a

permissible determination that the risk of allowing Barrett to bolster or supplement her testimony outweighed any potential benefit to Sheppard's defense.

Therefore, we affirm the circuit court's denial of relief.

### (d) Barrett's Relation to the Victim

Sheppard next argues that stress affected Barrett's ability to correctly identify the victim and that trial counsel was ineffective in cross-examining her on this point. However, the circuit court correctly concluded that Barrett could not be impeached regarding her initial fear that the victim was her nephew because she made no prior inconsistent statements. Barrett first told the police that she thought her nephew was injured during the shooting. She later told the police that she initially feared that her nephew was the victim of the shooting, but that she later realized that he was not the victim. At trial, Barrett testified that she was initially concerned that the victim of the shooting was her nephew; however, she ultimately did not know the victim, but that she "knew of him." Trial counsel could not have used Barrett's statements regarding her initial fear to impeach Barrett's trial testimony because they were not inconsistent statements. *See Lowe v. State*, 259 So. 3d

23, 43-44 (Fla. 2018); *see also Wilcox*, 143 So. 3d at 383.

Therefore, because "[t]rial counsel cannot be ineffective for failing to pursue meritless arguments," *Deparvine v. State*, 146 So. 3d 1071, 1093 (Fla. 2014) (citing *Owen v. State*, 986 So. 2d 534, 543 (Fla. 2008)), we affirm the circuit court's denial of relief.

### (3) Failure to Hire a Crime Scene Reconstructionist

Sheppard next challenges the circuit court's denial of his claim that his trial counsel was ineffective for failing to retain a crime scene reconstructionist to refute Barrett's account of the crime. We affirm the circuit court's denial of relief.

At the evidentiary hearing, Sheppard presented Dr. Michael Knox, an expert crime scene reconstructionist, to challenge Barrett's account of the shooting with measurements of the scene. In his testimony, Dr. Knox could pinpoint neither the exact location of the shooting nor Barrett's location when the shooting began. Later at the hearing, trial counsel testified that he did not hire a crime scene reconstructionist because he had knowledge of Sheppard's involvement in the shooting; and he feared that an accurate reconstruction of the crime scene would only prove Sheppard's guilt.

We agree with the circuit court's conclusion that Sheppard failed to show that trial counsel was deficient for failing to hire a crime scene reconstructionist. The circuit court found that Dr. Knox's reconstruction lacked specificity and did not undermine Barrett's trial testimony. Furthermore, the circuit court ruled that trial counsel's decision not to retain a crime scene reconstructionist was reasonable because the use of such an expert would have been fraught with risk considering Sheppard's confession to trial counsel. Accordingly, we affirm the circuit court's denial of relief.

### (4) Failure to Object to Inflammatory Statements

Sheppard also argues that the circuit court erred in denying his claim that trial counsel failed to object to unduly prejudicial statements made by Barrett and Detective Bowers at trial regarding Barrett's description of the victim and Barrett's agitated state. We affirm the circuit court's denial of relief with respect to this claim.

During Barrett's trial testimony, she referred to Wimberly as a "baby" or "little boy" three times. Trial counsel testified at the evidentiary hearing that these references were not objectionable, particularly when the jury saw photos of the victim, who was sixteen years old. We agree with the circuit court's conclusion that

trial counsel's strategy was reasonable and, therefore, not deficient. Furthermore, Sheppard cannot show prejudice. We agree with the circuit court's assessment that, given the brief nature of Barrett's description of the victim, and the State's theory of the case that Wimberly was a rival gang member who was murdered as a result of a gang dispute, there is no reasonable probability that but for trial counsel's failure to object to these statements the outcome of the trial would have been different.

Barrett's other statements at issue were expressions of fear that the shooter might return and harm her because she witnessed the crime. This Court considered these statements on direct appeal in the context of a fundamental error argument. We found no fundamental error because "Barrett did not know the identity of the shooter at the time she expressed fear of the shooter's possible return." *Sheppard*, 151 So. 3d at 1170. We have now considered these statements under *Strickland* and find no reasonable probability that the outcome at trial would have been different had trial counsel objected to these statements—nor do we find any error in the circuit court's conclusion that trial counsel did not perform

deficiently in letting these comments pass without objection.  *See Strickland*, 466 U.S. at 694.

Regarding deficiency, when assessing a claim of ineffective assistance of counsel, we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *See id.* at 689.  Considering Barrett's comments in the context of the entire record, we cannot say that trial counsel's decision not to object falls below the standard guaranteed by the Sixth Amendment.  The record shows that Barrett, who had since identified Sheppard as the shooter, stated her fear to provide an explanation for her failure to return to the police to give her statement immediately after the shooting.  On the point of prejudice, Sheppard cannot show that, but for trial counsel's failure to object to Barrett's expression of fear, there is a reasonable probability that the outcome of the trial would have been different.

With respect to Detective Bowers's testimony, the initial brief vaguely states that Bowers's testimony was "full of objectionable statements" which "unduly prejudiced" Sheppard.  However, the

brief does nothing more than recite in cursory fashion a portion of the testimony to which the argument applies and does not demonstrate error with respect to the circuit court's ruling as to any ineffective assistance of counsel claim related to the testimony summarily recited. We have found similar allegations in a brief "without any supportive argument or authority with regard to the manner in which trial counsel's conduct was deficient or the prejudice he sustained" insufficient to warrant relief, *Hannon v. State*, 941 So. 2d 1109, 1139 (Fla. 2006), and find Sheppard's argument regarding Detective Bowers's testimony similarly lacking.

Consequently, we affirm as to this issue without further analysis.

### (5) Failure to Challenge the Admission of the Video Recording of Sheppard's Interrogation

Sheppard further argues that his videotaped interrogation, which was played for the jury at trial, contained numerous prejudicial statements by Detective Bowers and that the circuit court erred in denying his claim that trial counsel was ineffective for failing to challenge the admission of the video. This Court considered the admission of the video on direct appeal and

- 33 -

concluded that it did not amount to fundamental error. *Sheppard*, 151 So. 3d at 1166. Applying *Strickland*, we now hold that the circuit court properly denied relief on Sheppard's claim of ineffective assistance of counsel because Sheppard failed to establish deficiency and, moreover, failed to establish prejudice. *See Strickland*, 466 U.S. at 687.

Regarding deficiency, the record shows that trial counsel made a strategic decision not to challenge the admission of the video because he had already viewed it and redacted the portions of the video he believed most damaging to Sheppard's defense. Mere dissatisfaction with trial counsel's strategy is not enough to satisfy *Strickland*'s deficiency prong where, as here, the strategy was reasonable. *Johnston v. State*, 63 So. 3d 730, 737 (Fla. 2011) ("There is a strong presumption that trial counsel's performance was not deficient." (citing *Strickland*, 466 U.S. at 690)).

In any event, Sheppard failed to make the showing of prejudice required by *Strickland*. In the video, when Bowers offered theories on how Sheppard committed the murder, Sheppard denied his involvement in the shooting. In light of the evidence adduced at trial that pointed to Sheppard's guilt, including the eyewitness

accounts and the identification of Sheppard as the shooter, there is no reasonable probability that the outcome of the trial would have been different had trial counsel been able to successfully preclude the jury from hearing the portions of the video he now argues should have been redacted. *See Strickland*, 466 U.S. at 694.

Therefore, we affirm the circuit court's denial of relief.

### (6) Failure to Challenge the State's Ballistic Evidence

Sheppard also challenges the circuit court's denial of his claim that his trial counsel was ineffective for failing to present an expert to challenge the State's ballistics expert. In rejecting this claim, the circuit court explained:

> At the evidentiary hearing, the defense called William Tobin, a forensic metallurgist material scientist to testify about toolmark examinations for firearms. (E.H. at 25-27.) Tobin testified specifically that the science of toolmark examinations, which Warniment performed, is not a real science and has no foundational validity. (E.H. at 50, 57, 67, 76.) Tobin also testified, however, that the examination Warniment did in this case is still commonly accepted practice in the forensic community. (E.H. at 99.)
>
> Julie Schlax, Fletcher's co-counsel at Defendant's trial, testified at the evidentiary hearing that she cross-examined Warniment at trial. (E.H. at 160-61.) According to Schlax, she did not want to make an issue of the science behind Warniment's testimony. (E.H. at 169.) "[I]f you try to make too large of a deal of the

science on the cross-examination technique when it is so widely accepted, you run the risk that—it's almost why are they protesting so much if they claim it wasn't him." (E.H. at 169.) She testified that based upon her experience with Warniment, it would not have been effective to attack his credibility and expertise. (E.H. at 169.) She also testified the defense theory was "regardless of whether or not the gun was at either scene, Mr. Sheppard wasn't the person pulling the trigger at either scene." (E.H. at 168.)

Similarly, Fletcher testified he has handled "hundreds if not thousands of cases [that] involve ballistic testimony." (E.H. at 242.) According to Fletcher, ballistics testimony, "specifically the identification of shell casings at one location to shell casings at another location is commonly accepted not only in law enforcement but in the courts and in the general public[.]" (E.H. at 242.) He stated it would not be an effective strategy to try to discredit ballistics testimony that is so commonly accepted. (E.H. at 242-43.) Fletcher further testified that Warniment was an excellent State witness whose testimony is "credible and believable." (E.H. at 242.) Like Schlax, Fletcher explained the defense was primarily that Defendant did not shoot either Stafford or Wimberly. (E.H. at 243.) "It was not the fact that those two cases were unrelated, it was the identification of the person behind the barrel of the gun[.]" (E.H. at 243.)

Counsels' strategy not to challenge the science behind Warniment's ballistics examinations was reasonable given the defense's theory that Defendant was not the shooter regardless of whether the murders were related. Moreover, Fletcher and Schlax reasonably believed that challenging Warniment's conclusions would hurt them in front of the jury. Counsel was not ineffective. *See Reynolds*, 99 So. 3d at 472 (concluding counsel not deficient when reasonably believed strategy

was correct); *see also Harrington v. Richter*, 562 U.S. 86, 111(2011) ("Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.").

The circuit court's findings are supported by competent, substantial evidence, and we agree with the circuit court's legal analysis. Accordingly, because Sheppard failed to establish deficient performance with respect to this claim, we affirm the denial of relief.

## B. Newly Discovered Evidence Claims

Sheppard next argues that the circuit court erred in denying two claims in which he sought relief based on newly discovered evidence. For the reasons below, we affirm the denial of relief as to both claims.

### (1) Roberts's Recantation

Sheppard's first newly discovered evidence claim centers on an affidavit in which Sheppard's former cellmate, Michael Roberts, recanted his trial testimony regarding Sheppard's inculpatory statements to Roberts. At the evidentiary hearing, the circuit court sustained the State's hearsay objection and properly allowed a proffer of the affidavit and testimony from members of the defense

team who had witnessed the recantation. The State was also allowed to proffer rebuttal testimony—witnesses who testified that Roberts had affirmed his trial testimony after the recantation and had explained that he only recanted to get Sheppard's postconviction counsel to leave him alone. Roberts died prior to the evidentiary hearing and Sheppard argues on appeal, as he did below, that the recantation evidence should have been admitted under the hearsay exception for statements against interest found in section 90.804(2)(c), Florida Statutes (2020). This statute states:

> (2) Hearsay exceptions.—The following are not excluded under s. 90.802, provided that the declarant is unavailable as a witness:
>
> . . . .
>
> (c) *Statement against interest.*—A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.

*Id.*

- 38 -

The circuit court concluded, without analysis, that Roberts's statement did not fall within this exception and therefore denied relief with respect to Sheppard's claim of newly discovered evidence. We agree with Sheppard that Roberts's statement would have been against his penal interests because his recantation could have resulted in his prosecution for perjury based upon his testimony at Sheppard's 2012 trial. *See* § 775.15(6), Fla. Stat. (2020) ("A prosecution for perjury in an official proceeding that relates to the prosecution of a capital felony may be commenced at any time.").[6] Accordingly, the circuit court should have next conducted the "trustworthiness" inquiry required by section 90.804(2)(c) to determine whether Roberts's statement fell within the hearsay

---

6. In *Lightbourne v. State*, 644 So. 2d 54, 57 (Fla. 1994), this Court reasoned that no reasonable person "would believe they were subject to a perjury penalty eight years after providing testimony at a trial." The Court in *Lightbourne* relied on section 775.15(2)(b), Florida Statutes (1991), which, at the time, set the statute of limitations at three years for perjury committed in a capital case. However, in 1997, the Florida Legislature amended section 775.15 to say, "A prosecution for perjury in an official proceeding that relates to the prosecution of a capital felony may be commenced at any time." Ch. 97-90, § 1, at 514, Laws of Fla. (amending § 775.15(1)(b), Fla. Stat. (Supp. 1996)). The statute has since been renumbered, but the language remains the same. *See* § 775.15(6), Fla. Stat. (2020).

- 39 -

exception. It did not. It is also true, however, that even assuming the admissibility of Roberts's newly discovered statement at retrial, Sheppard is not entitled to a retrial under the test we apply to newly discovered evidence.

To succeed on a claim of newly discovered evidence, the defendant must establish two prongs. *See Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998). First, the defendant must show that the evidence was not known by the trial court, the party, or counsel at the time of trial and it could not have been discovered through due diligence at the time of trial. *Id.* at 521. After establishing this prong, the defendant must show that the newly discovered evidence is of such a nature that it would probably produce an acquittal on retrial. *Id.*; *Jones v. State*, 591 So. 2d 911, 915 (Fla. 1991). When analyzing the second prong, " 'the trial court is required to "consider all newly discovered evidence which would be admissible" at trial and then evaluate the "weight of both the newly discovered evidence and the evidence which was introduced at the trial" ' . . . . This cumulative analysis must be conducted so that the trial court has a 'total picture' of the case." *Lightbourne v. State*, 742 So. 2d 238, 247 (Fla. 1999) (quoting *Jones*, 709 So. 2d at 521-22). "Newly

discovered evidence satisfies the second prong . . . if it 'weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.' " *Marek v. State*, 14 So. 3d 985, 990 (Fla. 2009) (quoting *Jones*, 709 So. 2d at 526).

This Court applies a mixed standard of review to a lower court's rulings on newly discovered evidence claims after an evidentiary hearing. It reviews findings of fact and credibility determinations for competent, substantial evidence and it reviews the application of law to the facts de novo. *See Marek*, 14 So. 3d at 990.

In Sheppard's case, even assuming, without deciding, that Roberts's statement is admissible[7] and that it constitutes newly discovered evidence, when considered in the total picture of the case, the statement is not of such a nature that it would probably produce an acquittal on retrial as required by the second prong of

---

7. Because recantations are rarely credible, *see Armstrong v. State*, 642 So. 2d 730, 735 (Fla. 1994), and given the testimony that Roberts disavowed the recantation affidavit after signing it, it appears unlikely that the circuit court would have resolved the admissibility issue in Sheppard's favor. However, because resolution of this issue involves credibility determinations that the circuit court was in the best position to make, we assume admissibility for purposes of our analysis.

*Jones.* The evidence of Sheppard's guilt is overwhelming and includes that Barrett witnessed Wimberly's murder and identified Sheppard as the shooter, *Sheppard,* 151 So. 3d at 1158-59; that ballistic evidence connected the Wimberly and Stafford murders by "show[ing] that the gun that fired two of the three projectiles recovered from Stafford's body was the same gun that killed Wimberly," *id.* at 1157; and that witnesses identified the car used during Wimberly's murder as the car that Sheppard and his codefendant were seen stealing, *id.* at 1159, which Sheppard later confessed to taking for a "joyride," *id.* at 1161. Considering Roberts's statement alongside additional evidence favorable to Sheppard developed on postconviction such as that relating to Mejors, which we address below, and comparing it to the overwhelming evidence of Sheppard's guilt from multiple sources that corroborate each other, Roberts's statement, although certainly not without impact, does not create reasonable doubt. *See Marek,* 14 So. 3d at 990. Therefore, we affirm the circuit court's denial.

### (2) Khalilah Mejors's Eyesight and State of Mind

Sheppard next argues that the circuit court erred in denying relief based on his claim of newly discovered evidence that Mejors

was smoking marijuana and not wearing her prescription glasses when she witnessed the Wimberly shooting. He also argues that the circuit court erred in denying his motion to continue the postconviction hearing in order to present Mejors's live testimony. We affirm the circuit court's denial on the merits for the reasons explained below, and because the circuit court addressed this claim on the merits based upon its acceptance of Sheppard's proffer of Mejors's expected testimony by affidavit, we find no abuse of discretion in the circuit court's denial of the continuance. *See Diaz v. State*, 132 So. 3d 93, 118 (Fla. 2013) (explaining that a trial court's ruling on a motion for continuance is reviewed for abuse of discretion and that "[a]n abuse of discretion is generally not found unless the court's ruling on a continuance results in undue prejudice to the defendant" (quoting *Randolph v. State*, 853 So. 2d 1051, 1062 (Fla. 2003))).

Turning to the merits, Mejors described the car used during the shooting as a "dark gray . . . Ford Crown Vic or Mercury." She also testified that the gun came out of the front passenger window and it was held by an African-American male; she could not see the shooter's face. According to Mejors, the gun was black and may

have been a Glock. She identified James's car as the car in which the shooter appeared. At the time of the shooting, Mejors was on a third-floor balcony smoking a "cigar."

Postconviction counsel discovered that Mejors was smoking marijuana at the time of the shooting and was not wearing her prescription glasses. The circuit court considered this proffered testimony and concluded that, though Mejors's new testimony constituted newly discovered evidence, Sheppard would not be entitled to relief because Mejors's testimony at trial was cumulative of the testimony of Sherrod, Carter, and Barrett.

We agree with the circuit court that this potential impeachment evidence would not entitle Sheppard to a new trial because it is not of such a nature that it would probably produce an acquittal on retrial. *See Jones*, 709 So. 2d at 521. Mejors's description of the car was cumulative of other evidence and consistent with the descriptions provided by other witnesses. Her testimony that the shooter was African-American was similarly cumulative. Impeachment of her testimony that the shooter was holding what appeared to be a Glock, though not cumulative, would not probably produce an acquittal on retrial given that Mejors did

not see more than one weapon being fired from the car during the shooting and that the State presented expert testimony that the shooter used a Smith and Wesson; and finally, because Sheppard's defense was misidentification and none of Mejors's trial testimony identified Sheppard as the shooter, any limited impeachment value of the newly discovered evidence does not weaken the case against Sheppard so as to give rise to a reasonable doubt as to his culpability. *Marek*, 14 So. 3d at 990.

Therefore, we affirm the circuit court's denial of this claim.

### C. *Giglio* and *Brady* Violations

Sheppard next argues that the circuit court erred in finding that *Brady* and *Giglio* violations did not occur at his trial with respect to (1) Michael Roberts, (2) Willie Carter, and (3) Khalilah Cook Mejors. We affirm the circuit court's denial with respect to these claims.

"To establish a *Brady* violation, the defendant has the burden to show that: (1) the evidence was either exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, the defendant was prejudiced." *Duckett v. State*, 231 So. 3d 393, 400 (Fla. 2017)

(quoting *Davis v. State*, 136 So. 3d 1169, 1184 (Fla. 2014)). To establish materiality or prejudice under *Brady*, the defendant "must demonstrate . . . a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial." *Smith v. State*, 931 So. 2d 790, 796 (Fla. 2006) (citing *Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

"To establish a *Giglio* violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." *Duckett*, 231 So. 3d at 400 (quoting *Guzman v. State*, 868 So. 2d 498, 505 (Fla. 2003)). Unlike a *Brady* claim for which the defendant bears the burden of proof as to the materiality prong, "[u]nder *Giglio*, once a defendant has established that the prosecutor knowingly presented false testimony at trial, the state bears the burden to show that the false evidence was not material." *Guzman*, 868 So. 2d at 507. "This requires the State to prove that the presentation of false testimony was 'harmless beyond a reasonable doubt,' *id.* at 506, or in other words, that 'there is no reasonable possibility that the error contributed to the conviction.' " *Ponticelli v. State*, 941 So. 2d 1073,

1088 (Fla. 2006) (quoting *Guzman*, 868 So. 2d at 506, and then *State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986)).

This Court applies a mixed standard of review to the lower court's determination of *Brady* and *Giglio* claims. It reviews the factual findings for competent, substantial evidence and reviews the legal conclusions de novo. *Duckett*, 231 So. 3d at 400.

### (1) Roberts

The facts supporting Sheppard's *Brady* and *Giglio* claims for Roberts's testimony are the same as the facts supporting the newly discovered evidence claim concerning Roberts's recantation. As noted above, Sheppard produced an affidavit and two witnesses to testify about Roberts's recantation. At the evidentiary hearing, the State presented Roberts's defense attorney, who testified that Roberts was not promised a deal on his pending charges in exchange for his testimony. The assistant state attorney who represented the State at Sheppard's trial, Caliel, also testified at the evidentiary hearing that he told Roberts that he could not make him any specific promises regarding his pending criminal charges. In support of his argument that the State had a deal with Roberts, Sheppard notes that Roberts's pending criminal charges were

resolved favorably, but he does not present evidence that this was due to any undisclosed deal that Roberts made with the State in exchange for his testimony.

Consistent with Caliel's postconviction testimony, the trial record also suggests that Roberts did not have an undisclosed deal with the State. Roberts testified at trial that his Duval County charge was dropped before Sheppard's trial began. Roberts also candidly testified that he was seeking reduced sentences in exchange for his trial testimony; the fact that he later received favorable sentences, without more, does not establish Sheppard's claim that Roberts entered into a specific deal with the State in exchange for his testimony. Moreover, Roberts's affidavit recanting his testimony is not inconsistent with his testimony at trial that he entered an open plea in the hope that the State would inform the court of his substantial assistance in Sheppard's case.

Though the circuit court denied the *Brady* and *Giglio* claims based on its ruling that Roberts's affidavit was not admissible evidence, we uphold denial of these claims on an alternative basis, namely that Sheppard did not show that the State willfully or inadvertently suppressed favorable evidence as necessary to prevail

under *Brady* or that the State presented testimony that it knew was false as required to prevail under *Giglio*. *See Robertson v. State*, 829 So. 2d 901, 906 (Fla. 2002) (explaining that an appellate court may affirm when the trial court reaches the right result for the wrong reason so long as there is a basis in the record to support the trial court's ruling).

### (2) Willie Carter

At trial, Carter testified that he witnessed Sheppard and Evans steal James's car. He identified Sheppard as the person who entered the driver's side of James's car. Carter was incarcerated during his testimony, but he testified that he did not have charges pending at the time of his testimony. On redirect, he clarified that he was serving a twelve-year sentence on a cocaine charge that was unrelated to his testimony. Sheppard argues that the State had a deal with Carter to recommend a sentence reduction in exchange for favorable testimony in Sheppard's case. To support this argument, Sheppard notes that the State filed a substantial assistance motion for Carter after he testified in Sheppard's trial and Carter received a reduced sentence. During the hearing on the

motion for reduction of sentence, the State mentioned that Carter had recently testified in Sheppard's case.

At Sheppard's postconviction hearing, Caliel testified that Carter was convicted and sentenced for his charges before his testimony in Sheppard's case and the motion for sentence reduction was for a separate matter. Caliel further explained that he became aware of the sentence reduction after the motion was filed and he did not provide testimony or attend the hearing. Moreover, Carter's trial testimony was consistent with his deposition testimony, which he gave before he was arrested on the charges that resulted in the twelve-year sentence.

Carter could not have been offered a deal for his testimony because he was not facing criminal charges when, during his deposition, he identified Sheppard as one of the people who stole James's car. Moreover, Caliel testified that he was unaware of any sentence reduction motion until after it had been filed by another state attorney. Therefore, we agree with the circuit court's legal conclusion that the facts are insufficient to show that the State violated *Brady* or *Giglio*.

### (3) Khalilah Cook Mejors

The facts of this claim are substantially similar to the facts of the newly discovered evidence claim related to Mejors. The only additional fact is that shortly after the shooting, Mejors told police that she was not wearing her prescription glasses when she witnessed the shooting. However, this information did not appear in any police reports, and the State only inquired about her vantage point, not her vision, during trial. Sheppard argues that the State knowingly concealed information of Mejors's nearsightedness because police knowledge is imputed to the prosecutor.

We agree with the circuit court that, even if Sheppard could show that the State withheld favorable evidence about Mejors's nearsightedness so as to violate *Brady* and that the State knowingly presented testimony that was false under *Giglio,* Sheppard would still not be entitled to relief. Mejors's testimony was cumulative, and her nearsightedness would not discredit her overall testimony, which was consistent with the testimony of other witnesses. Even presuming that Mejors's testimony about her vantage point was false within the meaning of *Giglio* for omitting that she was not wearing her prescription glasses, the error was harmless beyond a

reasonable doubt, as there is no reasonable possibility it contributed to the conviction. *See Ponticelli*, 941 So. 2d at 1088. Also, even assuming the State's suppression of favorable evidence, having failed under the more "defense friendly" materiality prong of *Giglio*, Sheppard cannot meet his burden to show "a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial" as required to establish materiality under *Brady*. *Smith*, 931 So. 2d at 796. Therefore, we affirm the circuit court's denial of relief.

## D. Cumulative Error

In the final issue of his appeal, Sheppard challenges the circuit court's denial of his cumulative error claim, in which he argued that "when considered as a whole," the "sheer number of types of errors in [his] guilt and penalty phases" deprived him of the fundamentally fair trial to which he was entitled under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We affirm the circuit court's denial of relief.

As explained above, trial counsel was not deficient in any respect; therefore, there is no cumulative prejudice to analyze with respect to Sheppard's ineffective assistance of counsel claims. *See*

*Sparre*, 289 So. 3d at 847 (explaining that where trial counsel is deficient in more than one area that the Court must "consider the impact of these errors cumulatively" (quoting *Parker*, 89 So. 3d at 867)).

Although we assumed violations of both *Brady* and *Giglio* with respect to Mejors, we conducted the required materiality analysis for both claims, and there are no additional *Brady* or *Giglio* violations to address. *See Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1334 (11th Cir. 2009) ("Considering the undisclosed evidence cumulatively means adding up the force of it all and weighing it against the totality of the evidence that was introduced at trial. That is the way a court decides if its confidence in the guilty verdict is undermined where a suppressed-evidence type of *Brady* claim is involved, or if [a violation of *Giglio*] was harmless beyond a reasonable doubt . . . .").

In affirming the circuit court's denial of the newly discovered evidence claim related to Mejors, we affirmed the circuit court's legal conclusion that the newly discovered evidence is not of such a nature that it would probably produce an acquittal on retrial, which required a cumulative consideration of the newly discovered

evidence in light of a total picture of the case.  *See Lightbourne*, 742 So. 2d at 247.  We conducted the same cumulative consideration in affirming the denial of the newly discovered evidence claim related to Roberts on the basis that, even if admissible, and even if newly discovered, Roberts's statement is not of such a nature that it would probably produce an acquittal on retrial.

Accordingly, we affirm the circuit court's denial of Sheppard's cumulative error claim.

## II. HABEAS PETITION

Sheppard presents two claims of ineffective assistance of appellate counsel in his petition for writ of habeas corpus.

Ineffective assistance of appellate counsel claims are properly raised in a habeas petition and are governed by the *Strickland* standard of ineffective assistance of trial counsel.  *See Frances v. State*, 143 So. 3d 340, 358 (Fla. 2014) ("[T]his Court's ability to grant habeas relief on the basis of appellate counsel's ineffectiveness is determined by the defendant's ability to meet both the deficiency and prejudice prongs of *Strickland*.").  "It is the defendant's burden to allege a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be

based." *Id.* at 357 (citing *Brown v. State*, 846 So. 2d 1114, 1127 (Fla. 2003)).

## A. Prosecutorial Misconduct

Sheppard argues that appellate counsel was ineffective for failing to argue on direct appeal that prosecutorial misconduct amounted to fundamental error. The alleged misconduct is that the State made multiple references to Sheppard's gang affiliation during the guilt phase after promising trial counsel that it would not pursue gang affiliation as an aggravator during the penalty phase.

Appellate counsel may be ineffective for failing to raise claims of fundamental error. *See Spencer v. State*, 842 So. 2d 52, 73 (Fla. 2003) (explaining that "an exception" to the rule that "appellate counsel will not be deemed ineffective for failing to raise issues not preserved for appeal" exists "where appellate counsel fails to raise a claim which, although not preserved at trial, presents a fundamental error"). Moreover, prosecutorial misconduct can constitute fundamental error. *See Greer v. Miller*, 483 U.S. 756, 765 (1987) ("[P]rosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due

process.' " (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974))).

However, the prosecutor in Sheppard's case did not engage in misconduct by presenting evidence of Sheppard's alleged gang affiliation to the jury during the guilt phase. Sheppard does not identify instances where the prosecution engaged in impermissible opening or closing argument or introduced inadmissible evidence during his trial. Sheppard references the video of his interrogation that was introduced at trial, which contains suggestions by the police officer that Sheppard was in a gang, but this Court considered the admission of that video on direct appeal and concluded that it did not amount to fundamental error. *Sheppard*, 151 So. 3d at 1165-68. Therefore, because this Court has already ruled that admission of the video was not fundamental error, Sheppard cannot establish that appellate counsel was ineffective. *See Breedlove v. Singletary*, 595 So. 2d 8, 11 (Fla. 1992) ("[A]ppellate counsel is not ineffective for not raising nonmeritorious issues."); *cf. Spencer*, 842 So. 2d at 74 ("[A]ppellate counsel raised this very issue on appeal and cannot be deemed ineffective for failing to prevail on a claim raised and rejected on appeal.").

For the foregoing reasons, the claim is denied.

## B. *Roper v. Simmons*[8]

Sheppard next claims that his appellate counsel was ineffective for failing to argue that *Roper* should be extended to preclude twenty-one-year-olds, Sheppard's age at the time of the murders, from receiving the death penalty. However, he acknowledges that a *Roper* extension claim cannot succeed on the merits under the law. *See Barwick v. State*, 88 So. 3d 85, 106 (Fla. 2011) ("[T]he Court has expressly rejected the argument that *Roper* extends beyond the [United States] Supreme Court's pronouncement that the execution of an individual who was younger than eighteen at the time of the murder violates the eighth amendment." (citing *England v. State*, 940 So. 2d 389, 406-07 (Fla. 2006))). Therefore, his claim must fail because appellate counsel cannot be ineffective for failing to bring a meritless claim. *See Breedlove*, 595 So. 2d at 11.

---

8. *Roper v. Simmons*, 543 U.S. 551 (2005).

# CONCLUSION

For the reasons stated above, we affirm the circuit court's order denying postconviction relief for all guilt phase claims and deny the petition for writ of habeas corpus.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
      Linda F. McCallum, Judge
      Case No. 162008CF011059BXXXMA
And an Original Proceeding – Habeas Corpus

Robert S. Friedman, Capital Collateral Regional Counsel, Dawn B. Macready, Assistant Capital Collateral Regional Counsel, North Region, Tallahassee, Florida, and Stacy R. Biggart, Special Assistant Capital Collateral Regional Counsel, Gainesville, Florida,

      for Appellant/Petitioner

Ashley Moody, Attorney General, and Michael T. Kennett, Assistant Attorney General, Tallahassee, Florida,

      for Appellee/Respondent